MICHAEL F. PERRETT AND MARI M. PERRETT, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4446–74, 5900–76.     Filed April 24, 1980.

*Harry Margolis* and *Richard Gladstein,* for the petitioners.
*Robert E. Casey,* for the respondent.

FEATHERSTON, *Judge:* This case was tried before Special Trial Judge Lehman C. Aarons pursuant to Rule 180, Tax Court Rules of Practice and Procedure. His report was served on the parties. Petitioners filed exceptions, and respondent filed a brief in response to petitioners' exceptions. After careful consideration, the Special Trial Judge's report, which is set forth below, is adopted with minor modifications.

REPORT OF THE SPECIAL TRIAL JUDGE*

AARONS, *Special Trial Judge:* Respondent determined deficiencies in the amounts of $9,172 and $45,065, respectively, in

---

*This report is prepared pursuant to Rule 182(b), Tax Court Rules of Practice and Procedure.

petitioners' Federal income tax for 1970 and 1972, together with negligence penalties under section 6653(a)[1] of $459 and $2,253, respectively. Two of the issues to be decided depend on determinations of the proper amounts of income, in 2 different years, of a partnership in which petitioner-husband was a partner. (An adjustment to partnership income will change the size of the portion of that income includable on petitioners' return.) After concessions by respondent, these issues are whether the partnership correctly deducted, in 1970, a loss on the sale of section 1244 stock, and whether the partnership is entitled to an interest deduction for certain payments in 1972. The third issue, although originally raised separately, has now been conceded by respondent to be an alternative to the stock loss issue. If we find that the partnership properly deducted an amount for loss on the sale of stock, we must consider whether petitioners realized income in 1972 from cancellation of indebtedness. Finally, we must determine whether petitioners are liable for additions to tax under section 6653(a).

A constitutional objection raised by petitioners is no longer an issue before this Court. This matter was disposed of when the Court granted respondent's motion to strike amendments to the petitions herein, for reasons set forth in a memorandum sur order dated October 27, 1978. This memorandum sur order is a part of the record in this case and fully sets forth the positions of the parties with respect to the constitutional issue as well as the Court's disposition of the matter.[2]

### FINDINGS OF FACT

Although Rule 91 of this Court's Rules of Practice and Procedure requires that the parties stipulate all matters to the fullest extent possible (and although an oral stipulation of

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

[2]Petitioners' constitutional claim was originally presented in the form of a motion for summary judgment, but with leave of the Court, the motion was withdrawn by petitioners, who were granted permission to embody their constitutional objection in the amendments to their petitions referred to above. In petitioners' briefs in this case, filed after trial and after the Court's order striking the amendments, petitioners' counsel requested that the motion for summary judgment be reinstated insofar as it related to the constitutional issue. We decline to do so. The matter was treated fully in the memorandum sur order and we stand on our reasoning and conclusions therein.

documents was made), no written stipulation of facts was filed in this case. This failure has compounded the Court's difficulties in synthesizing and making an orderly and understandable presentation of the extremely complex facts in this case. We believe all of the facts set forth below—obfuscating as they appear to be—are necessary for an understanding of the issues herein.

Petitioners resided in Ventura, Calif., at the time the petitions herein were filed. Their Federal income tax returns for 1970 and 1972 were filed with the Internal Revenue Service Centers in Ogden, Utah, and Fresno, Calif., respectively.

Michael F. Perrett (hereinafter petitioner) was an attorney during the years involved herein in the firm Hathaway, Clabaugh & Perrett (HCP). In 1970, the law firm was operating as a partnership (the partnership). At that time, two of the partners were active in the business of the firm. Hathaway had retired almost completely from the practice of law and owned a nominal share of the partnership, if any. In mid–1971, the law practice was incorporated, although the partnership continued in existence as a vehicle for managing other interests of the partners. During this period, Clabaugh concentrated, for the most part, on administrative law problems and trials. Petitioner, generally responsible for overseeing the business affairs of the firm, was certified as a specialist in the law of taxation by the State Bar of California.

In 1970, prompted by concern for financing his children's education, petitioner decided to establish some kind of trust or other fund for their use. Petitioner discussed this matter with Harry Margolis (Margolis), an attorney whom he had met a few years earlier through a former business associate. Together they agreed on a plan, detailed below, which provided for trusts for petitioner's children, a series of loans, and the purchase by the partnership of stock in Jowycar Music Corp. (Jowycar).[3]

By execution of three trust agreements dated October 23, 1970, petitioners created a trust for each of their three minor children. The agreements named as trustees John Webster and Robert Soares (two former business associates of petitioner), and

---

[3]The use of such words as "purchase," "loan," and "interest" in our findings of fact and opinion is for convenience, following the form of the transaction, and is not intended to indicate any conclusion concerning the actual substance of the transactions in question.

Patrick Perrett (petitioner's brother). At some later point, Webster and Patrick Perrett resigned and David Schmutte, petitioner's accountant, was substituted. The initial corpus of each trust was $10.

Signing a note dated December 2, 1970, petitioner borrowed $100,000 from Anglo Dutch Capital Co. (Anglo Dutch). Anglo Dutch, during this period, was a California corporation engaged in the business of lending money. Petitioner's loan was negotiated on behalf of Anglo Dutch by Margolis, who was president of the company and owned one-half of the stock. (An accountant associated with Margolis' law firm owned the other half.) The note, bearing a maturity date of December 1, 1971, required the payment of quarterly interest installments at the rate of 10 percent annually. The loan was unsecured.

The next step in the plan was the loan by petitioner of the $100,000 to his children's trusts. Soares, as trustee, signed an agreement to borrow money, dated December 6, 1970, and a promissory note, dated December 7, 1970, on behalf of each of the three trusts. Two of the notes were in the amount of $33,333.33. The third was for $33,333.34. Each note promised payment of principal on demand and provided for annual interest payments at 3 percent, with the first payment due January 31, 1972.

On December 10, 1970, loan agreements and promissory notes were executed for the loan of $100,000 by the Perrett children's trusts to the HCP partnership. The terms of these documents provided that the partnership would pay principal to the trusts on demand and 6-percent interest annually on or before December 31 of each year, beginning in 1971. At approximately the same time, the partnership borrowed $100,000 from two trusts created for Clabaugh's children. This money had been borrowed by the trusts from Clabaugh, who had also originally borrowed it from Anglo Dutch. After the three sets of loans had been completed, the partnership had $200,000 with which to purchase stock in Jowycar.

In early October 1970, Jowycar was essentially an inactive corporation. Associated Arts, N.V., was its sole shareholder; the corporation's officers were Ben Margolis, brother of Harry Margolis; John McTernan; and Elaine Fischel, an attorney and associate of Margolis.

In late October, Jowycar was revived so that it might be used

as a vehicle for investment by the partnership and others. Associated Arts had agreed to be redeemed out of the corporation to make way for the new investors. Before the redemption, new officers were elected: Robert Dunnett, an attorney employed by Margolis; Dr. Alexander Ellenberg, a prospective purchaser of Jowycar stock; and Marjorie Trover, an employee of Margolis. Jowycar's business address was the same as that of Margolis' law firm.

It was planned to use the proceeds of the new issue of Jowycar stock to help finance a real estate venture of Bonaire Development Co. (Bonaire), a California corporation. In return, Jowycar was to receive from Bonaire a right to receive certain payments, specifically a one-half interest in a secured obligation which was referred to as "the pledge." The affairs of Bonaire were controlled by Margolis or his delegates. Bonaire's relationship with Jowycar involved three different tracts of real estate. The first of these was a parcel of 206 acres located in San Diego, Calif. (the 206 acres).

Under the terms of an agreement of sale dated June 1, 1970, Bonaire agreed to purchase the 206 acres from Universal Decoration Leasing Co.[4] The purchase price was set at $1,907,536, and the agreement recited that Bonaire's note for $100,000 of the amount was attached. As payment of the balance, Bonaire contracted to assume two obligations of the seller, Universal Decoration Leasing Co., i.e., a note to World Minerals, N.V., in the amount of $1,656,286, and a note to M.A.C. Joint Venture in the amount of $150,000 plus $1,250 interest. This 206-acre parcel was subject to two deeds of trust. The first of these, in order of priority, was referred to as the "Jacobs-Forbes" deed of trust. The second, referred to as the "Greater West" deed of trust, dated May 27, 1966, was executed originally to secure a promissory note in the sum of $1,656,286, signed by the Greater West Co. (Greater West) in favor of Sunset International Petroleum Corp. (Sunset). At the time Bonaire acquired an interest in the 206 acres, Sunset's position as creditor on the note and beneficiary under the deed of trust had been assigned to Scientific Land Projects, Inc. (Scientific), and

---

[4]Universal Decoration Leasing was the original shareholder of Jowycar, from 1967 to 1970. The agreement of sale was signed "Ben Margolis, president" on behalf of Universal Decoration Leasing.

World Minerals, N.V., had succeeded to Greater West's obligation on the note.[5]

Attached to the Greater West trust deed form were two typewritten pages containing additional provisions. The first of these provided for release of portions of the 206 acres from the deed of trust. Under certain conditions—

partial reconveyances of separate portions of the real property covered hereby may be had and will be given from the lien and charge of this Deed of Trust upon the payment of an amount to be applied upon the principal of the indebtedness secured hereby equal to the sum of $9,000 per acre multiplied by the total number of such acres of real property to be so released for each such parcel so reconveyed.

A separate paragraph, as follows, also provided for subordination of the trust deed to an "institutional deed of trust":

This Deed of Trust, provided no unrescinded notice of default under the terms hereof then appears of record, is hereby made subject and subordinate to a Deed of Trust ("Institutional Deed of Trust") to be hereinafter executed by the Trustor, or its successors in interest. Said Institutional Deed of Trust shall cover the property described herein and may (but shall not be required to do so) cover land other than the real property described in this Deed of Trust and the Institutional Deed of Trust shall secure a loan made by any bank, insurance company or correspondent thereof, savings and loan association, or other institutional lender, which loan shall not exceed a sum equal to the total number of acres of real property described in this Deed of Trust multiplied by *$15,000.* * * *

In addition, a boldface legend, appearing directly above the signatures of the parties to the deed of trust agreement, stated:

NOTICE: THIS DEED OF TRUST CONTAINS A SUBORDINATION CLAUSE WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY INSTRUMENT TO OBTAIN LOANS, PORTIONS OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

The second piece of property involved in the Bonaire-Jowycar relationship was a parcel of 109 acres, also located in San Diego (the 109 acres). By an agreement dated July 2, 1970, Bonaire arranged to acquire this property from World Minerals, along with a pledge secured by the property. The agreement indicates

---

[5]Although this obligation was apparently offset by the note in the same amount from Universal Decoration Leasing Co. to World Minerals, N.V., referred to above, it appears that title to the 206 acres was transferred several times, in effect subject to the $1,656,286 mortgage obligation.

that the 109 acres was subject to an outstanding deed of trust in the amount of $1,456,900, plus interest.[6]

"The pledge"[7] referred to in the agreement of July 2, 1970, arose from a transaction involving the third parcel of land, this one located in the City of Thousand Oaks, Calif. On or about August 31, 1965, Sunset (or its predecessor in interest) entered into a joint venture agreement with the Douglas R. MacAvoy organization (MacAvoy) concerning the operation and management of the Thousand Oaks property, which was then owned by MacAvoy. MacAvoy then leased the property to the joint venture, and, as part of the lease, the joint venture was granted an option to purchase the leasehold property between 1970 and 1975, at graduated prices. The lease agreement provided for semiannual payments to MacAvoy to keep the option open. Under the terms of the joint venture agreement, Sunset undertook, among other things, to pay all the joint venture's costs of the option, including the purchase price if and when the option was exercised by the joint venture. To secure its promises with respect to the option, Sunset executed a pledge agreement in which it assigned to MacAvoy its interest in two notes on which Sunset was entitled to receive payments totaling, in principal amounts, $1,456,000. One of these notes, for $1,256,000, was secured by a deed of trust on the 109 acres referred to above. The pledge agreement provided that should Sunset fail to perform its obligation, MacAvoy could sell the notes and apply the proceeds to amounts overdue or due in the future. Any remaining proceeds were to be credited to all items ultimately found to be due to MacAvoy from Sunset.

By 1967, Del Cerro Associates (Del Cerro), a California partnership, had succeeded to MacAvoy's interests under Sunset's joint venture agreement, including Sunset's pledge of the $1,456,000 in notes.[8] During 1967, a controversy arose between Sunset and Del Cerro over the alleged default of Sunset in

[6]Only $1,256,900 was actually secured by a deed of trust on the property. This deed of trust, together with an additional $200,000 unsecured note, were the assets "pledged," as described hereinafter.

[7]Since this is the pledge in which Jowycar was to acquire an interest, an understanding of the terms of the pledge and its value is crucial to our determination.

[8]It appears that Del Cerro also succeeded to fee title to the 109-acre parcel which secured the notes.

certain of its duties. As a compromise, Sunset and Del Cerro entered into a pair of agreements in December 1967. Sunset promised to pay Del Cerro $1,200,000 or certain shares of stock in a specified corporation. All other obligations of Sunset to Del Cerro were canceled, except those relating to the purchase option, which was to continue in force until Sunset made the promised payment. The option payment obligation was modified slightly in one of the agreements, dated December 15, 1967, which provided in part as follows:

3. Del Cerro further agrees that Sunset shall be relieved of any and all personal obligations and liabilities as to any prior or future payments of $30,000 each on December 1 and May 1 annually in order to keep said Option in full force and effect pursuant to the provisions of Paragraph 11.1.4 of said Indenture of Lease dated August 31, 1965. Subject to the next preceding sentence, the next payment under said Paragraph 11.1.4 shall be in the sum of $90,000 and shall be due December 1, 1968 and thereafter the sum of $30,000 shall be due on May 1 and December 1 as previously required.

4. Del Cerro and Sunset agree that Sunset's obligations to exercise Lessee's option to purchase pursuant to said Indenture of Lease (except to the extent said option provisions have been hereinabove amended in Paragraph 3) shall remain in full force and effect.

On June 1, 1970, Sunset filed a petition in bankruptcy under chapter X of the Bankruptcy Act.

By July 1970, the time of the agreement of sale between Bonaire and World Minerals, World Minerals had succeeded to ownership of the 109 acres, as well as Del Cerro's interest in the option payments and pledge. It was this interest, along with all of World Minerals' title and interest in the 109 acres, which World Minerals agreed to convey to Bonaire, effective upon Bonaire's payment, prior to October 31, 1970, of $300,000 to World Minerals.

On October 19, 1970, Bonaire and Jowycar entered into an agreement for loan guarantee, which provided as follows:

AGREEMENT FOR LOAN GUARANTEE

This Agreement is entered into the 19th day of October, 1970, by and between JOWYCAR MUSIC CORPORATION and BONAIRE DEVELOP-MENT COMPANY, both California corporations, hereinafter referred to as JOWYCAR and BONAIRE.

WITNESSETH:

WHEREAS, BONAIRE owns and wishes to develop 206 acres of land located in San Diego County, California, and

WHEREAS, BONAIRE will acquire an obligation secured by a pledge of a Deed of Trust on 109 acres of land located in San Diego County, California, and

WHEREAS, BONAIRE has cash flow problems, and

WHEREAS, JOWYCAR is willing to assist BONAIRE in solving such problems in return for compensation,

Now, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed:

1. The property which BONAIRE wishes to develop is subject to a first deed of trust [Jacobs-Forbes] recorded October 25, 1954, which is presently in default but not under foreclosure which BONAIRE believes can be released at a cost of approximately $1,840 an acre. There is also on said property presently a second deed of trust [Greater West] dated May 27, 1966, which comes due May 31, 1971, but which provides for subordination to an institutional loan. The holder of said second deed of trust is required to pay the total obligation of the first deed of trust.

2. BONAIRE proposes to acquire an obligation which is now in default but as to which there is now $90,000 due as of December 1967;[9] $60,000 each year additional for 1968 and 1969, and $30,000 to date for 1970. $30,000 additional is to be paid in December, 1970, and $60,000 each year thereafter through 1975. This obligation is secured by a deed of trust in the sum of $1,456,000 on 109 acres of unimproved land, which deed of trust is now pledged as such security.

Simultaneously with the acquisition of the obligation secured by the pledge, BONAIRE proposes to acquire the fee ownership of the 109 acres itself.

3. BONAIRE will borrow $300,000 from Union Bank immediately upon the exclusive security of the 206 acres owned by BONAIRE. This loan will be subject to conditions which require that BONAIRE deliver to Union Bank an A.L.T.A. policy of title insurance showing Union Bank in first position on the property which is security for the loan. BONAIRE expects to be able to accomplish this by obtaining the subordination provided for in the second deed of trust and then paying off the first deed of trust. Until this can be done, Union Bank requires a guarantee of the loan before it will be made.

As soon as the foregoing is accomplished, BONAIRE expects to proceed with additional loans for the development of the property all in a form consistent with the subordination provisions of the second deed of trust. BONAIRE will utilize all of the proceeds from all of the loans to clear and develop the property.

4. JOWYCAR will undertake to guarantee to Union Bank the BONAIRE loan. JOWYCAR will do so at its own risk and cost and waiving all recourse to BONAIRE. In return BONAIRE will assign and set over to JOWYCAR an undivided one-half interest in the pledge as soon as BONAIRE acquires it. JOWYCAR shall receive no interest in the 109 acres. The parties contemplate that they will proceed to foreclose the pledge at the earliest possible date.

5. This agreement shall be binding upon the successors and assigns of the parties hereto.

---

[9]According to the terms of the compromise agreement dated Dec. 15, 1967, the $90,000 payment was due in December 1968, not 1967. (See p. 118.)

IN WITNESS WHEREOF, the parties have set their hands and seals the day and year first above written.

> BONAIRE DEVELOPMENT COMPANY
> By (S)  Irwin Gostin
> IRWIN GOSTIN, *President*
>
> JOWYCAR MUSIC CORPORATION
> By (S)  Robert Dunnett
> ROBERT DUNNETT, *President*

Jowycar then initiated steps to guarantee the Union Bank loan to Bonaire and on November 4, 1970, executed a security agreement and a continuing guarantee and authorizing resolution. On November 5, 1970, a check for $300,000 was drawn to the order of Union Bank on the account of Harry Margolis, trustee. This was an advance on behalf of Jowycar which was used to purchase a non-interest-bearing $300,000 certificate of deposit.

Under the terms of the security agreement, in case of default, Union Bank was permitted to foreclose on Jowycar's pledge without proceeding against Bonaire. If Union Bank were to proceed in such a manner, Jowycar would be subrogated to Union Bank's position with reference to Bonaire.

On the same day, November 5, 1970, Bonaire executed a promissory note in the amount of $300,000 to Union Bank and signed a deed of trust on the 206 acres (Bonaire deed of trust) "For the Purpose of Securing [the note], in such order of priority as Beneficiary may elect." Although Bonaire was not a party to the November 4 security agreement between Jowycar and Union Bank, a provision of that agreement stated that Bonaire was required to deliver within 30 days to Union Bank a title insurance policy showing Union Bank in a position superior to Scientific (beneficiary under the Greater West deed of trust). Bonaire thereafter (despite its October 19, 1970, agreement with Jowycar to utilize all the loan proceeds "to clear and develop the property") transferred $300,000 to World Minerals for the purchase of the 109 acres and "the pledge." By a letter dated November 11, 1970, Bonaire informed Jowycar that it had acquired the pledge and property. Bonaire stated that it believed all claims arising under "the pledge" prior to November 5, 1970, were for the account of Bonaire alone. Bonaire also assigned to

Jowycar a one-half interest in the proceeds of any post-November 5, 1970, claim under "the pledge."

In the meantime, Jowycar prepared and issued additional stock which was claimed to be qualified for the benefits of section 1244.[10] During November 1970, appropriate applications were submitted to the California Department of Corporations. The HCP partnership purchased 200 shares of Jowycar stock for $200,000· with a check dated December 2, 1970, to Harry Margolis, trustee. However, Margolis did not forward the $200,000 to Jowycar until December 7, 1970. (On December 7, 1970, Jowycar also wrote a check to Margolis for $200,000 to repay a portion of the advance Margolis made for the certificate of deposit.) In making this purchase, the partnership relied on the advice of Margolis.

Michael Chatzky, an attorney who was associated with Margolis' law practice and who represented Jowycar, purchased 1 share of Jowycar stock for $1,000 with a check to Jowycar dated December 2, 1970. In this same time period, Dr. Alexander Ellenberg, a Margolis client, bought 100 shares, and Dr. Charles Ramsden bought 50 shares of stock. The Jowycar stock held by Associated Arts, the only other shareholder, was redeemed by the corporation on December 14, 1970.

Bonaire allegedly expected to take advantage of the provision of the Greater West trust deed which required subordination to a subsequent "Institutional Deed of Trust" so that Union Bank might secure a position of priority over Scientific, the beneficiary of the Greater West deed of trust. However, Scientific refused to subordinate to Union Bank. Nor was Bonaire able to obtain a title insurance policy showing Union Bank in a position of priority.

Petitioner had been aware, prior to his partnership's stock purchase, of Scientific's resistance to the subordination plan and the possibility that litigation with Scientific would be necessary. Nevertheless, relying completely on Margolis' advice, he entered into the stock purchase without any concern as to specific details and without ever having reviewed any financial statements or

---

[10]The only evidence in the record that the new stock issue qualified under sec. 1244 is testimony of Michael Chatzky, attorney for Jowycar, that he followed the provisions of sec. 1244. Respondent, however, does not contend that the procedural steps to qualify the stock under sec. 1244 were not taken.

documents of the entities involved. Petitioner did discuss with Margolis the possible benefits of the investment, including tax benefits arising from either the failure or the success of the Bonaire venture.

Within less than 2 weeks of Jowycar's receipt of $200,000 from the partnership, Margolis, acting on behalf of Anglo Dutch, offered to purchase one-half of the partnership's stock at one-half of the original price per share (100 shares at $500 per share, or $50,000, for which the partnership had paid $100,000).[11] As petitioners' counsel, Margolis advised that the HCP partnership sell only half of its 200 shares. The partnership once again relied on Margolis' advice. An application dated December 23, 1970, for consent to transfer the stock to Anglo Dutch was filed for the partnership with the California Department of Corporations. On December 30, 1970, Anglo Dutch executed an agreement with all of the Jowycar shareholders to buy various numbers of shares from each of them. The recitals set forth in the agreement were in part as follows:

WHEREAS, sellers are wary of the possibility of a foreclosure by Union Bank pursuant to the loan guarantee agreement in which Jowycar Music Corp. agrees to guarantee the performance of Bonaire Development Company in that loan agreement by and between Bonaire Development Company and Union Bank, and

WHEREAS, purchaser is willing to accept the risk of such a foreclosure, and

WHEREAS, sellers are willing to sell said shares of Jowycar Music Corp. stock to purchaser at a sales price which is less than the sellers' acquisition cost of said shares due to the possibility of unwanted litigation, and

WHEREAS, purchaser is willing to purchase said shares at the offered discounted sales price.

Provision was also made for sale of the shares retained by the investors in Jowycar as follows:

In the event that Union Bank forecloses its loan to Bonaire Development Company then those remaining shares which have been retained by sellers shall hereby be agreed to be sold to purchaser at Fifty Percent (50%) of sellers' acquisition cost of said shares plus Fifty Percent (50%) of the proceeds which Jowycar Music Corp. receives from the foreclosure of that pledge of a deed of trust on One Hundred and Nine (109) Acres of land located in San Diego County, California which was referred to in the loan guarantee agreement by and between Jowycar Music Corp. and Bonaire Development Company on

---

[11]Margolis contacted Chatzky about the sale of his own share and the shares of his client, Dr. Ellenberg, sometime between Dec. 8 and Dec. 15, 1970, approximately.

October 19, 1970, referred to above. In the event that Union Bank does not foreclose on its loan to Bonaire Development Company, then purchaser hereby agrees to purchase and sellers hereby agree to sell those shares which are retained by sellers at a sales price equal to the sellers' acquisition costs of said shares plus Fifty Percent (50%) of the fair market value of any interest held by Jowycar Music Corp. in the pledge of a deed of trust on the One Hundred and Nine (109) Acres of land located in San Diego County, California, referred to above, or on Fifty Percent (50%) of the fair market value of the land itself should Jowycar Music Corp. acquire any interest in said One Hundred and Nine (109) Acres of Land.

Anglo Dutch delivered to the HCP partnership a $50,000 check dated December 29, 1970. In return, the partnership delivered to Anglo Dutch a check in the same amount, half of which was applied to the principal of petitioner's $100,000 note with Anglo Dutch, and half of which was applied to Clabaugh's note.

On its partnership return for 1970, HCP reported a $50,000 ordinary loss, under section 1244, on the sale of the 100 shares of Jowycar stock. One-half of this loss is reflected in the income from partnership reported by petitioners on their 1970 return.

During the first days of February 1971, action was taken on the Union Bank loan to Bonaire. Jowycar paid off Bonaire's obligation to the bank, an obligation in the amount of $302,133.34, including interest. The proceeds of the certificate of deposit, $300,000 which Union Bank had been holding as security, were deposited to Jowycar's account to cover the payment. The bank also assigned the note and the deed of trust securing the obligation to Jowycar. Bonaire removed Union Bank as trustee on the trust deed and substituted Title Insurance Co.

Under the terms of a pledge agreement signed July 26, 1971, the partnership pledged its 100 shares of Jowycar stock as security for the existing debts of petitioner and Clabaugh to Anglo Dutch. Each of the two partners remained indebted in the amount of $75,000 principal, plus $4,549 interest. Anglo Dutch agreed, if the notes should not be paid within 60 days of the due date (December 1, 1971),[12] that it would accept the stock in full payment of principal and all interest.

Sometime prior to the execution of this pledge agreement,

---

[12]The original notes were canceled on Dec. 2, 1971, when Anglo Dutch renewed the loans to both petitioner and Clabaugh and prepared new notes. These renewed notes were never executed by petitioner and Clabaugh.

litigation among Scientific, Bonaire, Jowycar, and others had been commenced. However, no final determination was reached until much later, approximately May 1972.

On March 13, 1972, an agreement was signed by the partnership, the trustees of the Perrett trusts, and petitioner. This agreement provided that petitioner would assume sole liability for the partnership's indebtedness to each trust. (Similarly, agreements between the partnership, Clabaugh, and the Clabaugh trusts were also made.) Although the partnership had made, as required, interest payments to the Perrett trusts totaling $6,000 on December 30, 1971, no payments of principal had been made. The total indebtedness assumed by petitioner amounted to $100,000 principal. As part of the agreement, the partnership promised to prepay $100 interest to each trust for 1972. These payments were made on April 25, 1972, along with payments to the Clabaugh children's trusts totaling $300.

On the day following petitioner's assumption of the partnership's liability to the Perrett trusts, i.e., on March 14, 1972, an agreement was executed which provided for the distribution by the partnership of the remaining 100 shares of Jowycar stock, 50 shares each to Clabaugh and petitioner. Soon after this distribution of stock, petitioner made a gift of these 50 shares, subject to his obligation to Anglo Dutch of $75,000 plus interest (secured by the stock), to the three trusts he had created for his children. A written instrument recording this gift was executed on April 13, 1972, and a formal acceptance of the gift was signed by the trustees. By a letter dated April 25, 1972, the trustees elected to forfeit the stock to Anglo Dutch in exchange for cancellation of the debt. When this debt was canceled, the amount outstanding on the note which the trusts assumed (originally signed by petitioner to Anglo Dutch for $100,000 at 10 percent) was $75,000 principal and $15,799 interest. Although the original note required interest payments to be made quarterly, no interest had ever been paid on the obligation.[13]

On their fiduciary returns for the tax year which included the month of April 1972, the trusts reported a total of $25,000 (split

---

[13]At the time of trial, the debt of the Perrett children's trusts to petitioner, after some payments of principal and interest, had been forgiven in installments. Petitioner has continued to make payments of both principal and interest on the debt (originally the partnership's) to the trusts, which he assumed in March 1972.

more or less equally among the three trusts) of capital gain on this surrender of stock and debt cancellation. The partnership's basis in the shares had been $50,000 (50 shares at $1,000 each), and the trusts realized an aggregate amount of $75,000 from forgiveness of the debt principal. The trusts did not report any income from forgiveness of the interest due, nor did they deduct the forgiven interest.

Certain litigation in the Superior Court of California for the County of San Diego involving Scientific, Bonaire, and Jowycar was concluded during February 1972, at which time the court announced its intended decision. The written findings of fact and conclusions of law filed by the court were dated May 9, 1972. The court found that all the transactions surrounding the $300,000 loan to Bonaire by Union Bank and the subsequent foreclosure by the bank on Jowycar's security were mere shams in furtherance of Margolis' plan to make the Bonaire deed of trust to Union Bank appear to be prior and superior to the Greater West deed of trust. The court's findings state that the Bonaire deed of trust was not entitled to priority over the Greater West deed and that, because of Bonaire's default, Scientific became the owner (through nonjudicial foreclosure) of the 206 acres, subject to the lien of the prior Jacobs-Forbes trust deed and the cloud of the Bonaire deed of trust.[14]

After the result of the above litigation was clear, Jowycar and Bonaire entered into a rescission agreement, executed on April 3, 1972. The agreement recited that Jowycar had guaranteed the loan by Union Bank to Bonaire, that Jowycar had been required to pay on the guarantee, and that litigation concerning the priority position of the Bonaire deed of trust (of which Jowycar was beneficiary) had resulted in judgment against Jowycar. Under the agreement, Jowycar waived all right to a one-half interest in the pledge by Sunset,[15] and Bonaire promised to pay

---

[14]At trial, petitioners' counsel objected strenuously to the introduction of the California court's findings of fact and conclusions of law. We do not pass upon the legal effect of those findings and conclusions on the outcome of the instant case, because we have not given them any weight in reaching our own conclusion. However, we believe it is clear that those findings and conclusions are admissible to prove the fact of their own rendition, as part of the chain of events herein involved. *Diamond v. New York Life Ins. Co.*, 50 F.2d 884 (7th Cir. 1931); *Kortz v. Guardian Life Ins. Co.*, 144 F.2d 676 (10th Cir. 1944); S. Gard, 3 Jones on Evidence, sec. 17:75 (6th ed. 1973).

[15]Prior to this date, Jowycar had never received anything from its interest in the pledge.

Jowycar $302,133.34, exactly the amount (without additional interest) that Jowycar had paid as guarantor in February 1971 to satisfy Bonaire's obligation. If Bonaire did not pay Jowycar within 60 days, the agreement provided that the obligation would bear interest at 10 percent. A payment of $302,133.34 was credited to Jowycar's account on June 23, 1972.

During the years in issue, Jowycar had no substantial investments other than its interest in the Bonaire venture. Its balance sheet indicates a retained earnings deficit as of July 1, 1971, and an increased deficit on June 30, 1972. Jowycar's only significant non-interest income in the period July 1970 through June 1972 came from the sale in December 1970, for $5,000, of music rights left over from the period prior to the partnership's investment.

After examination of the partnership's return for 1970, respondent disallowed a $50,000 ordinary loss deduction arising from the sale of Jowycar stock, because, in the words of the audit report, the purchase and sale of the stock were not established to make up a "bona fide transaction that should be recognized for tax purposes." In respondent's notice of deficiency to petitioners for their 1970 return, respondent determined a corresponding upward adjustment of $25,000 in petitioners' income. The partnership audit report for 1972 also reflects respondent's disallowance of the partnership's complete interest deduction (totaling $1,936) because of the partnership's failure to show that an indebtedness was incurred, that the interest was paid, and that the transactions giving rise to the indebtedness should have been recognized for tax purposes. Respondent has conceded a portion of this deduction; all that remains in dispute for 1972 is the $600 paid to the Perrett and Clabaugh trusts. Respondent also originally determined that the partnership realized ordinary gain of $168,658 from the cancellation of its obligation to Anglo Dutch. The notice of deficiency to petitioners for 1972 indicates respondent's additions to their income of $968 and $84,329 for petitioners' share of the increase in these two items of partnership income, respectively, as determined by respondent. In his trial memorandum in this case, respondent modified his position somewhat by contending that the gain from cancellation of the debt to Anglo Dutch was realized directly by petitioners and not by or through the partnership. On brief, respondent further altered his position and now raises this

issue only if the Court should find that petitioners' purchase and sale of Jowycar stock was a bona fide transaction recognizable for tax purposes.

Petitioners contend that these transactions were bona fide and that the deductions were properly taken.

## OPINION

Petitioners seek to deduct their portion of a loss on the sale of Jowycar stock owned by petitioner's law partnership. The partnership purchased 200 shares of the stock in December 1970 with money obtained, through a series of back-to-back loans, from Anglo Dutch. Although the partnership paid $1,000 per share for the stock, just a few weeks later (yet before the close of the taxable year) it sold half of the stock to Anglo Dutch for $500 per share. After 7 months (July 1971), Anglo Dutch agreed to accept the remaining 100 shares as sole and complete security for the outstanding debt, which amounted to $150,000 plus interest. This security arrangement gave each share a value of over $1,500. The debt was finally canceled in exchange for the stock 9 months later, in April 1972.

The issues in this case require us to determine whether the substance of these transactions comported with their form. This substance-form principle has been variously stated. As the Court said in *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971):

> It has repeatedly been held that the substance of a transaction rather than the form in which it is cast is determinative of tax consequences unless it appears from an examination of the statute and its purpose that form was intended to govern. The following represent merely a random selection from a wide variety of such cases that are too numerous for comprehensive listing: *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 265–267; *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334; *Griffiths v. Helvering*, 308 U.S. 355; *Higgins v. Smith*, 308 U.S. 473; *Minnesota Tea Co. v. Helvering*, 302 U.S. 609; *Gregory v. Helvering*, 293 U.S. 465; *Weller v. Commissioner*, 270 F.2d 294 (C.A. 3), affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26; *William R. Lovett*, 37 T.C. 317. * * *

A loss on the sale of stock is deductible only when the original purchase of the stock and the sale itself are bona fide. See, e.g., *Du Pont v. Commissioner*, 118 F.2d 544 (3d Cir. 1941), affg. 37 B.T.A. 1198 (1938), cert. denied 314 U.S. 623 (1941); *Cowan v. Commissioner*, 30 B.T.A. 296 (1934), affd. per curiam 88 F.2d 1007 (6th Cir. 1937); *Morgan v. Commissioner*, 46 T.C. 878, 893

(1966). After careful consideration of the circumstances surrounding the purchase, sale, and pledge of the Jowycar stock in this case, we are convinced that the transactions which engendered the loss which petitioners seek to deduct were not bona fide. The transactions, from petitioners' standpoint, had no substantial economic purpose or effect other than tax reduction. See *Knetsch v. United States*, 364 U.S. 361, 365–366 (1960); *Gilbert v. Commissioner*, 248 F.2d 399, 411 (dissenting opinion by Judge Learned Hand) (2d Cir. 1957).

Initially, we do not believe that the original purchase of the stock by the HCP partnership was at arm's length. One ground for this belief is the complete absence of any investigation by the partnership into Jowycar's affairs. Indeed, petitioner invested indirectly (through loans to the trust and the partnership) $100,000 of borrowed funds, even though he was aware of possible problems in the investment, without asking for any of the details involved. Although petitioner was in effect the managing partner of the law firm, he sought little or no information about the financial situations of Jowycar and Bonaire. Petitioner has stated that he merely followed the advice of Margolis.

Had petitioner investigated the affairs of Jowycar, he would have discovered that on November 4, 1970, Jowycar had guaranteed, without recourse to Bonaire, a $300,000 loan to Bonaire by Union Bank and that Union Bank required that it receive within 30 days (by December 4, 1970) a title insurance policy indicating its position of priority with respect to the 206 acres. Petitioner would also have learned that the success of the investment in Jowycar was closely related to the acquisition of the required title insurance policy, since without the policy it was likely that the bank would foreclose on Jowycar's guarantee in case of a default by Bonaire. Without knowledge of these facts, petitioner caused his partnership to submit a check for the shares dated December 2, 1970, just 2 days before the deadline for acquiring the insurance policy. Moreover, that check was written to Margolis' trustee account; the purchase funds were not actually transferred to Jowycar until December 7, 1970, 3 days after the deadline set by Union Bank. Although petitioner contends that he followed the advice of Margolis, his failure to delay the few days which would have allowed a more accurate

evaluation of the investment strongly suggests a lack of bona fides in the purchase.

Because of petitioner's lack of concern for the details of Jowycar's business dealings, he was also unaware of the highly speculative nature of the consideration Jowycar was to receive for the substantial risks of guaranteeing the Union Bank loan. Under the terms of the "Agreement for Loan Guarantee," as clarified by Bonaire's letter of November 11, 1970, Jowycar was to obtain a one-half interest in all claims arising after November 5, 1970, under an agreement which obligated Sunset to pay $30,000 twice annually (in May and December) through 1975. Sunset's promise was secured by a deed of trust on the 109 acres. The payments were required to be made in order to keep open an option to purchase land. If the option were exercised, Sunset was also required to provide the purchase price.

If Sunset had made its payments as required, the most Jowycar could have received would have been $165,000 (it was entitled to half of the scheduled December 1, 1970, payment), at the rate of $30,000 per year. However, Sunset was in default in its obligation when Jowycar agreed to accept this one-half interest (October 19, 1970), and Jowycar never received any payments from Sunset. Sunset had filed a petition in bankruptcy just 4½ months before. Payments were necessary to keep the option in force. It is possible that as a result of Sunset's default, the option had lapsed. If so, further payments would have been pointless. Although the guarantee agreement recites that the parties expected to foreclose on the deed of trust securing Sunset's obligation as soon as possible, it appears that this was never accomplished. (The record discloses no effort to realize on the deed of trust.) Even if such action had been taken, Jowycar still could not have received more than $30,000 per year. In actuality Jowycar received nothing. In the light of Sunset's financial condition and the origin of its obligation, the disparity between the risk Jowycar took in guaranteeing the loan to Bonaire and the possible benefit Jowycar could receive for that risk indicates that the partnership had little to gain from an investment in Jowycar.

Another factor which leads us to the conclusion that the purchase of Jowycar stock was not bona fide is the sudden drop in the stock's value, as indicated by the partnership's purchase and subsequent sale. Petitioner would have us believe that the

value of the Jowycar stock plummeted from $1,000 per share on December 7, 1970 (when payment for the partnership's shares was made to Jowycar), to $500 around December 15, 1970 (when Margolis first contacted Jowycar shareholders with Anglo Dutch's offer to purchase their stock). The agreement of sale of December 30, 1970, states that the sellers were "wary of the possibility of a foreclosure by Union Bank." However, petitioners have pointed to no circumstance or event which made the possibility of foreclosure any more real on December 15, 1970, than on December 7, 1970. Foreclosure by Union Bank on Jowycar's guarantee could only follow default by Bonaire, which was run by Margolis. The deadline for obtaining a title insurance policy passed on December 4, 1970. Petitioner's witness, Chatzky, who had handled Jowycar's legal matters, testified that the likelihood of litigation with Scientific had increased. Nevertheless, petitioner had been aware that litigation was possible when he arranged to buy the stock. The difficulty Bonaire encountered in early December 1970 in obtaining title insurance should have indicated the probable necessity of action against Scientific. We simply do not believe that the outlook for the success of the Jowycar venture had deteriorated sufficiently in the 8 days between December 7 and December 15, 1970, to justify the difference between the partnership's purchase and sale prices.

Chatzky testified that in late December 1970, Jowycar stock was worth only half of its early December purchase price because that was the value set by a willing buyer and a willing seller. This view ignores certain important facts. Anglo Dutch, the buyer, was half-owned by Margolis, who was the corporation's president and who negotiated the purchase on behalf of Anglo Dutch. (The other half of Anglo Dutch was owned by Margolis' employee.) Margolis, as petitioners' counsel, also advised them to sell half of the partnership's shares at that price. Most of the rest of Jowycar's shareholders were also Margolis' clients. The officers of Jowycar were either employees of Margolis or shareholders of the corporation. Furthermore, Bonaire, on which the success of the Jowycar venture depended so heavily, was controlled by Margolis. Under the circumstances, it strains credulity and rationality to believe that the partnership's purchase and closely following sale were at arm's length.

The contrived nature of the Jowycar investment scheme is further evidenced by the circumstances surrounding the disposi-

tion of the partnership's remaining stock. In July 1971 (7 months after the December 1970 sale), Anglo Dutch agreed to accept the remaining stock as security in full for payment, in case of default, of all the principal and accrued interest on the debts of Clabaugh and petitioner. However, the sale agreement of December 1970 had already made provision for the purchase of the remaining shares by Anglo Dutch, in the event of Union Bank's foreclosure on Jowycar's guarantee, at the same price (one-half of the partnership's original purchase cost) plus half of any of the proceeds Jowycar might have received from Sunset's option payment. The record provides no explanation as to why Anglo Dutch accepted the partnership's remaining stock as complete security for the partners' liabilities when, under the terms of the December 1970 sale agreement, it could have purchased those shares for less than one-third of the amount of the principal and interest due on those debts.

Chatzky testified that litigation with Scientific was in progress in July 1971 when the remaining stock was pledged to Anglo Dutch and that prospects for a result favorable to Jowycar varied during this period. It is difficult to understand how the uncertainty at that time of the results of litigation fully explains the threefold increase in the value of the Jowycar stock indicated by Anglo Dutch's acceptance of the stock pledge. Jowycar had no substantial investments which might affect the value of its stock other than its interest in the Bonaire venture. Its balance sheet indicates a retained earnings deficit as of July 1, 1971, and an increased deficit on June 30, 1972. Jowycar's only significant noninterest income in the period July 1970 through June 1972 came from the sale, for $5,000, in December 1970 of music rights left over from the period prior to the partnership's investment.

In April 1972, the pledged Jowycar stock was forfeited to Anglo Dutch and petitioner's debt was canceled. Chatzky testified that the rescission agreement executed between Bonaire and Jowycar on April 3, 1972, increased the value of the stock before it was surrendered. Under this rescission agreement, Bonaire promised to repay Jowycar the $302,133.34 it had paid Union Bank as guarantor. In exchange, Jowycar, released its interest in the Sunset option payments.

The rescission agreement, whatever effect it may have had on the value of the Jowycar stock, does not alter our conclusion

concerning the absence of an arm's-length sale. One reason is that the rescission occurred subsequent to the pledge, at a time when Anglo Dutch was already committed to accepting the stock. In addition, Jowycar had waived all recourse to Bonaire in the original guarantee agreement. Bonaire's repayment, which appears to have been gratuitous, is thus highly suspicious and of little influence in assessing the value of the Jowycar stock, especially in the light of Margolis' control of the entities and transactions involved. Moreover, the $302,133.34 payment, which was made after the Perrett trusts surrendered the stock, inured not to petitioners' benefit but to the benefit of Anglo Dutch, which owned most (if not all) of the Jowycar stock outstanding at that time.

Under all these circumstances, we are compelled to the conclusion that the $100,000 loan from Anglo Dutch to petitioner was intended from the outset to be nothing other than a nonrecourse loan, i.e., collectible only out of the Jowycar stock. Only a naive person would borrow $100,000 on any other basis for such a risky investment and for a potential return so speculative that, even initially, it was practically nonexistent. In substance, the HCP partnership was merely a nominal participant in a transaction between Anglo Dutch and Bonaire. Jowycar was simply a device for getting petitioner and others an immediate tax deduction with no financial outlay[16] or risk. Viewing objectively the total picture as set forth in our findings, we are convinced that it reveals a labyrinthian design of tax avoidance (with respect to petitioners herein) and a concomitant hopelessness from the beginning of any economic benefit or effect, other than tax reduction, to the petitioners.[17] For these reasons, we conclude that petitioners are not entitled to a loss deduction for that sale.[18]

---

[16]Petitioner never paid interest on the loan from Anglo Dutch, although the terms of the note required quarterly interest payments.

[17]It is this absence of an appreciable nontax effect which distinguishes this case from those relied upon by petitioners. Contrast the facts herein with those of *Hill v. Commissioner*, 63 T.C. 225 (1974), affd. per order (9th Cir., Feb. 22, 1977). See *Bridges v. Commissioner*, 325 F.2d 180 (4th Cir. 1963), affg. 39 T.C. 1064 (1963).

[18]Because of our conclusion that no bona fide loss was incurred we need not reach respondent's affirmative contention that petitioners realized income through forgiveness of indebtedness. Moreover, even if we were to find that petitioners did incur a bona fide loss in the sale of the stock, it is not clear that it would qualify for ordinary loss treatment. Sec. 1.1244(c)–1(g)(2), Income Tax Regs., provides that such treatment is not available with respect

Even if we conclude that petitioner's failure to investigate the Jowycar investment does not indicate negligence on his part, his ignorance of the facts of Jowycar's finances and investments does not alter our conclusion concerning the non-arm's-length nature of the 1970 stock purchase and sale. See *MacRae v. Commissioner*, 34 T.C. 20, 27–28 (1960), affd. on this issue 294 F.2d 56, 59 (9th Cir. 1961), cert. denied 368 U.S. 955 (1962). As the court wrote in *Lynch v. Commissioner*, 273 F.2d 867, 872 (2d Cir. 1959), affg. 31 T.C. 990 (1959):

Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers. Beyond this, it would strain credulity to the breaking point to suppose that taxpayers had no inkling that something highly unusual was going on. * * *

We now turn to the interest deduction issue. Petitioner and his partner Clabaugh each borrowed $100,000 from Anglo Dutch and in turn loaned[19] his $100,000 to his children's trusts. Within 8 days of the original Anglo Dutch loan, the money was borrowed from the trusts by the HCP partnership. These loans were documented by unsecured demand notes at 6-percent annual interest to be paid on or before December 31 of each year. Petitioners contend that they are entitled to deduct half of the $600 paid by the partnership to the trusts as "interest" in April 1972. All of the loans were part of a prearranged tax plan which included the purchase of Jowycar stock.

Section 163(a) provides for the deduction of "all interest paid or accrued within the taxable year on indebtedness." "Interest" means compensation paid for the use of borrowed money. *Old Colony R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932); *Deputy v. du Pont*, 308 U.S. 488, 498 (1940). "Indebtedness" has been defined as "an unconditional and legally enforceable obligation for the payment of money." *Autenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940). Of course in order to be deductible, interest must be paid on genuine

---

to stock of a corporation which is not largely an operating company within the 5 most recent taxable years. See *Davenport v. Commissioner*, 70 T.C. 922 (1978); *Bates v. United States*, an unreported case (N.D. Ohio 1976, 37 AFTR2d 76–1090, 76–1 USTC par. 9367). It appears likely that Jowycar would not meet the operating company requirement because its guarantee to Union Bank was its only substantial transaction after the date that it was revived through the issuance of stock to petitioners and others.

[19]See n. 3 *supra*.

indebtedness (*Knetsch v. United States*, 364 U.S. 361 (1960))—indebtedness in substance and not merely in form.

The facts herein are closely analogous to those in *Elbert v. Commissioner*, 45 B.T.A. 685 (1941). (See also *Guaranty Trust Co. v. Commissioner*, 98 F.2d 62 (2d Cir. 1938).) In *Elbert*, the petitioner created a trust with a corpus of $300,000 for her daughter. Three days later, as prearranged, the trustees gave petitioner a check for $298,000 in exchange for her unsecured demand note at 6-percent interest. (No date was fixed for payment of principal or interest.) The Court ruled that petitioner was not entitled to a deduction for interest paid to the trust on the note. "The trust was merely a convenient conduit, and petitioner in effect is claiming a deduction for interest on money 'loaned' to herself." *Elbert v. Commissioner, supra* at 690.

The Perrett and Clabaugh children's trusts also served as a convenient conduit between the partners and the partnership. In effect, petitioner and Clabaugh (through the partnership) borrowed their own money. Indeed, in March 1972, the partners formally assumed the partnership's obligations to the trusts. The interposition of the trusts in this series of loans served no other purpose than allowing the partners to make contributions (through the partnership) to their children's trusts which they would deduct as interest. Nor would they pay gift tax on contributions made under the guise of loan repayments. The trusts' role in the series of loans was without substance; petitioner subsequently forgave the Perrett trusts' obligations to him. We conclude that the transactions between the trusts and the partnership were not loans in substance and that the trusts were mere conduits, as in *Elbert*. Consequently the partnership, and petitioners, are not entitled to an interest deduction.

The final issue for determination is whether petitioners are liable under section 6653(a) for additions to tax for the years 1970 and 1972. Section 6653(a) provides for a 5-percent negligence penalty whenever "any part of any underpayment" is due to "negligence or intentional disregard of rules and regulations."

Petitioners contend that they attempted to legally minimize their taxes and that they relied on expert tax planning advice to do so. However, reliance on expert advice does not necessarily insulate the taxpayer from the negligence penalty. As the Court said in *Pritchett v. Commissioner*, 63 T.C. 149, 174 (1974): "The

general rule is that the duty of filing accurate returns cannot be avoided by placing responsibility on an agent. *Herbert Enoch, supra; James Soares,* 50 T.C. 909 (1968)." Moreover, although a purpose to avoid tax does not ipso facto establish negligence, we think that the built-in loss aspect of the December 1970 Jowycar stock purchase and sale was so egregiously and patently untenable that the Court is justified in holding that the penalty is applicable. Cf. *Wesenberg v. Commissioner,* 69 T.C. 1005, 1015 (1978). Petitioner is a tax specialist certified by the State Bar of California and should have realized that the claimed stock loss arose from a sale that was not at arm's length and lacked substance for tax purposes.

We consider the loans from the trusts as on the borderline of the negligence area. Although the trusts and loans were part of a plan to shift income and avoid taxes within the family groups, we have resolved our doubts on this issue in petitioners' favor and hold that the failure of such plan for reasons set forth herein is not in itself a sufficient ground for assertion of the penalty.

In accordance with the foregoing, it is held that respondent is sustained in his disallowance of the interest deduction and the deduction for loss on the sale of stock as well as in his assessment of the negligence penalty for 1970. We sustain petitioner with respect to the 1972 negligence penalty.

---

Subsequent to the filing of the report of the Special Trial Judge herein, petitioners filed a memorandum of exceptions to the findings of fact and opinion set forth in the report. The first portion of petitioners' memorandum restates objections and arguments previously made on brief and in earlier stages of the lengthy proceedings in these cases, including matters discussed and disposed of in the opening portion of this report. However, petitioners have raised an additional argument with which we now deal.

Petitioners cite *Weimerskirch v. Commissioner,* 596 F.2d 358 (9th Cir. 1979), a recent Circuit Court decision reversing an opinion of this Court (67 T.C. 672 (1977)), which had sustained a deficiency based upon a determination of the Commissioner that the taxpayer had received unreported income from the sale of narcotics. The Circuit Court held that the so-called presumption of correctness normally attaching to a deficiency determination by the Commissioner is not alone sufficient to sustain such a

determination, absent at least some prima facie showing by the Commissioner that the taxpayer was engaged in the alleged income-producing activity. Petitioners rely upon *Weimerskirch*, claiming that the deductions in question here arose from transactions which were factually uncontroverted, that respondent has not attempted to prove that the transactions did not in fact take place, and that respondent acted arbitrarily and is relying solely on the so-called presumption of correctness.

Clearly, however, the principle of *Weimerskirch* is not applicable here. This case involves claimed deductions rather than a reconstructed income issue. The record in the instant case is voluminous. True it is that most of the evidence was introduced by petitioners to establish the formal factual structure of the transaction in question. True it also may be that respondent did not attempt to disprove that certain factual events took place (such as transfers of money, execution of documents, etc.). However, it is the substantive legal consequences of such events which are being challenged here; respondent is contending that the substantive reality of the alleged transactions is not what their form suggests and is not the stuff of which tax deductions are made. Clearly, respondent is not merely sitting back and blindly relying on any presumption with respect to his determinations. Here, respondent maintains that the transactions at issue lacked significant economic substance and, for that reason, the disputed deductions arising from such transactions are denied. See *Knetsch v. United States*, 364 U.S. 361 (1960); *Thompson v. Commissioner*, 66 T.C. 1024 (1976).

In the instant case, although petitioners presented most of the evidence to establish the prima facie factual framework for the deductions claimed, we are convinced that respondent has clearly established, by his own evidence and by persuasive characterization of petitioners' factual facade in consonance with normal human experience, that the transactions in question lacked the economic substance requisite to the tax deductions claimed. Certainly, respondent's position in this case can in no way be likened to the sole reliance on the so-called presumption in his favor which was considered unjust in *Weimerskirch*, an income reconstruction case.

We note that respondent has excepted to the Special Trial Judge's conclusion that the addition to tax under section 6653(a)

for 1972 is not applicable. On consideration of all the evidence, we think the exception is without merit.

To reflect the foregoing,

> *Decision will be entered for the respondent in docket No. 4446-74.*

> *Decision will be entered under Rule 155 in docket No. 5900-76.*