SULEIMAN K. ABUL-HAJ AND ELIZABETH ABUL-HAJ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Abul-Haj v. Commissioner
Docket Nos. 6062-72; 4465-74; 8979-75.
United States Tax Court
T.C. Memo 1988-507; 1988 Tax Ct. Memo LEXIS 530; 56 T.C.M. (CCH) 536; T.C.M. (RIA) 88507; October 20, 1988. Theodore J. England, for the petitioners. M. Catherine McKenna, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, *531 Judge: These consolidated cases were assigned to Special Trial Judge Hu S. Vandervort pursuant to the provisions of section 7456(d)(4) of the Code (redesignated section 7443A(b)(4) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq. of the Tax Court Rules of Practice and Procedure.[1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE VANDERVORT, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: ADDITIONS TO TAX
DOCKET NO.
YEAR
DEFICIENCY
SECTION 6653(a)
8979-75
1968
$   7,405.09
$    --   6062-72
1969
39,030.08
1,951.50
4465-74
1970
16,568.09
828.50
4465-74
1971
111,975.09
5,599.50
These deficiencies were based upon the following adjustments to petitioners' income, *532 deductions, and credits for the years in issue: Adjustments to Petitioners' Income
1968
1969
1970
1971
Partnership
Income
$ 5,254.00
$ 39,887.71
$ 24,278.00
-- Depreciation of
Rental Dwelling
and
--
11,039.00
6,987.00
$ 4,033.00 Related Expenses
Interest Expense
9,000.00
1,839.00
--
52,000.00 Interest Income
--
9,000.00
--
-- Capital Gains
--
--
1,222.00
(54,131.00)
Ordinary Income
--
--
--
165,000.00 ITC Disallowed
--
638.71
--
-- The issues for decision are: A. Whether petitioners are entitled to the deductions and credits they have claimed as their distributive share of the net losses and investment tax credits of Professional Properties Partnership (PPP) for the taxable years 1968, 1969, and 1970. B. Whether petitioners must recognize $ 1,222 in taxable income for the year 1970 to reflect their distributive share of PPP's capital gain and the disallowance of PPP's short-term capital loss. C. Whether petitioners owned a rental house so that they are entitled to deduct depreciation, interest, and taxes related to the rental house for the taxable *533 years 1969, 1970, and 1971 and had either capital gain or ordinary income on its purported sale. D. Whether petitioners are entitled to deduct interest expenses claimed during the taxable years 1968, 1969, and 1971. E. Whether petitioners must recognize $ 9,000 in interest income received from Bonaire Development Co. for the taxable year 1969. F. Whether petitioners are liable for additions to tax under section 6653(a). FINDINGS OF FACT Certain facts have been stipulated and are so found. This reference incorporates the stipulation of facts and attached exhibits with the reservation of respondent as to the legal effect of stipulated documents and substance as opposed to form of all documents. The petitioners resided in Ventura, California when they filed their petitions. These cases arise out of the tax planning of Harry Margolis (Margolis), a California attorney who specialized in tax planning. He and others employed in his law office organized the PPP partnership, provided legal and accounting services, and arranged its financing. Howard Lund, an attorney, arranged many of the transactions in these cases and introduced petitioners to Mr. Margolis. [2]
*534 Margolis employed a number of foreign and domestic "system entities" for implementing his clients' tax plans. These system entities included: Anglo Dutch Capital Co. (Anglo Dutch), Associated Convalescent Enterprises (ACE), Bonaire Development Co., (Bonaire), Branjon, Inc., Universal Decorating Leasing (Universal), World Development Co., and World Minerals, N.V.
Capital Interest in PPP
Certain issues related to PPP have been previously litigated in Abraham v. Commissioner,T.C. Memo. 1974-19, where this Court found that petitioner Suleiman Abul-Haj acquired a capital interest in PPP on or about September 29, 1967. The parties have agreed to abide by this Court's decision in Abraham and respondent, therefore, agrees that petitioner had a capital interest in the partnership. Petitioners claim to have contributed $ 134,000 to PPP between 1967 and 1971, and to have received $ 25,000 from PPP in capital distributions. An amended partnership agreement dated December 1967, indicated that petitioner Suleiman Abul-Haj held a 7.45-percent interest in PPP. An amended partnership agreement dated December 1969, showed that he owned a 14.3-percent interest in PPP. *535 On January 20, 1971, petitioner sold his interest in PPP to a fellow partner, Franklin L. Ashley, for $ 90,000. Respondent contends that, in substance, petitioners contributed only $ 75,000 to PPP and received $ 31,000 in capital distributions. It is respondent's position that $ 59,000 of petitioners' contributions in 1969 and 1970 were paid from the proceeds of loans from Margolis system entities and do not constitute valid capital contributions. The parties have agreed that petitioners realized a $ 110,835 capital gain from the sale of the partnership interest, rather than $ 90,000 of ordinary income as determined by the statutory notice of deficiency.
Partnership Losses and Tax Credits[3]
PPP's 1968 partnership return reported a net loss of $ 404,105.16. Petitioners' distributive share of that loss was $ 30,118, of which they deducted $ 30,000 on their 1968 tax return. Respondent examined PPP's 1968 return, however, and found unreported rental income of $ 71,948 attributable to a lease with L.E.A. Citrus, Inc. This adjustment decreased PPP's 1968 net loss to $ 322,157 and respondent accordingly decreased petitioners' distributive share *536 of partnership losses by $ 5,254. PPP's 1969 partnership return reported a net loss of $ 243,948.23 and an investment tax credit of $ 9,124. Petitioners' distributive share of this loss was $ 25,203.21 which they deducted on their 1969 tax return. Respondent examined PPP's 1969 return, however, and disallowed the tax credit and various deductions which totaled $ 420,162.28. The disallowed deductions included: $ 228,087.89 for interest expense, $ 86,701.65 for rental depreciation, $ 44,744.89 for non-rental depreciation, $ 37,015.00 for legal and professional fees and $ 23,612.85 for management fees. These adjustments increased PPP's 1969 income from the reported net loss of $ 243,948.23 to a net income of $ 176,214.05. Accordingly, respondent increased petitioners' 1969 partnership income by $ 39,887.71 and decreased their 1969 tax credit by $ 638.71. The parties have agreed to abide by this Court's holding in Abraham v. Commissioner, supra. Respondent agrees that PPP was entitled to deduct an additional $ 75,000 for interest expense in 1969 leaving $ 153,087.89 of the partnership's 1969 interest deductions in dispute. See Appendix. *537 Accordingly, PPP's corrected 1969 net income in issue is $ 101,214.05, rather than $ 176,214.05. Also, the $ 39,887.71 adjustment to petitioners' 1969 partnership income must be recalculated. PPP's 1970 partnership return reported a net loss of $ 162,597.66. Petitioners' distributive share of that loss was $ 23,251 which they deducted on their 1970 tax return. Respondent examined PPP's 1970 return, however, and disallowed various deductions totaling $ 169,933.66. The disallowed deductions included: $ 100,826.98 for rental depreciation, $ 33,334.20 for legal and professional fees, $ 24,222.98 for accounting fees, and $ 12,901.20 for salaries and payroll benefits. Accordingly, PPP's 1970 income was adjusted from a reported net loss of $ 162,697.66 to a positive net income of $ 7,335.37. Respondent also increased petitioners 1970 partnership income by $ 24,278 to reflect this change. For 1970, respondent also disallowed PPP's $ 32,946.58 long term capital loss, and increased PPP's section 1231 gain by $ 3,454.73. Petitioners' capital gains were increased by $ 1,222.00 to reflect his distributive share of these adjustments.
The Saratoga House
Dale Fuller and Richard *538 Bassett conveyed a house in Saratoga, California (the Saratoga house) to Continental Title in a grant deed dated January 2, 1969. On March 31, 1969, a document was executed to purportedly transfer the Saratoga house from World Development Co. to petitioners. The document provided that Continental Title Co. was to hold title to the property on petitioners' behalf. The purported transfer of the Saratoga house was negotiated through Mr. Lund; petitioners never met with a representative of World Development. In exchange for the property, petitioners claim to have assumed an existing encumbrance of approximately $ 36,000 held by Great Western Savings and Loan Association (Great Western), and to have issued a $ 44,000 promissory note to World Development. Petitioner testified that he did not formally assume the existing encumbrance through a written agreement, but had merely considered himself "responsible" for the monthly mortgage payments of $ 290. The original mortgage instrument is not part of the record here. World Development's 1969 tax return contained a schedule which indicated that the Saratoga house had been sold for $ 79,858 and that the property had a book value of $ *539 50,912, resulting in a gain of $ 28,946. The purported sale of the Saratoga house was allegedly made subject to an existing lease between World Development and Mr. Lund. The second page of the lease purported to assign World Development's leasehold interest to petitioners as of April 1, 1969. Monthly rent under this lease was stated to be $ 290. Petitioners reported rental income from the property of $ 2,610 in 1969, $ 3,480 in 1970, and $ 2,320 in 1971. The record here contains no evidence that petitioners received rental payments from Mr. Lund. In the event we find that petitioners never owned the Saratoga house, there could not have been rental income from the house, and respondent so agrees. Mr. Lund purportedly agreed to pay property taxes and maintenance expenses on the property. Contrary to this purported agreement, petitioner claims to have paid property taxes of $ 1,248.26 on the Saratoga house during 1969. Petitioners deducted the following amounts for depreciation, interest, and taxes related to their alleged ownership of the Saratoga house: $ 11,039 in 1969, $ 6,987 in 1970, and $ 4,033 in 1971. Petitioners purportedly paid $ 25,000 towards retiring their $ *540 44,000 promissory note to World Development. On June 19, 1970, the note was purportedly assigned to World Minerals, N.V. and petitioners purportedly paid $ 45,000, repaying the principal and $ 1,000 in accrued interest. This purported payment was in apparent disregard of the prior $ 25,000 purportedly paid on the same note. The purported source of this $ 45,000 payment was a purported $ 75,000 loan to petitioner from Universal. In August 1971, petitioners purported transferred the Saratoga house to Mr. Lund for $ 75,000 after discovering that the property required $ 20,000 in repairs. Petitioners did not investigate the need for these repairs. The property was not listed with a realtor. The property was apparently transferred from petitioners to Mr. Lund without a written instrument as none is in the record. Petitioners claim to have received $ 11,184.89 of the $ 75,000 proceeds from the alleged sale, contending that approximately $ 36,000 was transferred to Great Western, $ 25,000 was transferred to ACE, and $ 1,810.42 was used to pay delinquent property taxes. Petitioners reported capital gains of $ 1,216 resulting from the purported sale of the Saratoga house. Respondent, *541 claiming that petitioners never owned the Saratoga house, disallowed petitioners' deductions for depreciation and other expenses related to the rental dwelling. Respondent, presumably in the alternative, determined that if petitioners did own the house, they had no basis in the property and must recognize the entire $ 75,000 received as ordinary income.
Childrens' Trusts and Related Loans
On April 18, 1968, petitioner Suleiman Abul-Haj established three trusts. The claimed purpose of these "Clifford" trusts was to provide financial support for his childrens' education. The trustees were Elmer Clabaugh, an attorney, Charles Myer, an accountant, and Mr. Lund, who drafted the trust instrument. The initial corpus of each trust was allegedly $ 30,000. The source of these funds was an alleged loan from Anglo Dutch. Petitioners issued a document entitled as a promissory note to Anglo Dutch for the alleged $ 90,000 principal, with interest payable quarterly at 10 percent per annum. The alleged loan was arranged by Mr. Lund and was allegedly secured by petitioners' personal assets. On the same day that these alleged trusts were established, Mr. Lund, acting as trustee, allegedly *542 transferred the full corpus of each trust to Branjon, Inc. The record contains evidence that Anglo Dutch mailed a $ 90,000 check directly to Mr. Margolis on April 17, 1968. On May 15, 1968, petitioners allegedly borrowed an additional $ 30,000 from Anglo Dutch for his medical practice. Petitioners issued a document entitled as a promissory note to Anglo Dutch for $ 30,000 with interest payable quarterly at 10 percent per annum. These purported two promissory notes to Anglo Dutch were allegedly consolidated into a purported single $ 120,000 note on December 31, 1968. On December 26, 1968, petitioners claim to have paid Anglo Dutch $ 9,000 for interest accrued during that year on the $ 90,000 note. This purported payment was the basis for petitioner's 1968 interest deduction. Respondent disallowed this interest deduction. On February 19, 1969, petitioners allegedly borrowed another $ 20,000 from Anglo Dutch, bringing their total alleged indebtedness to $ 140,000. Petitioners claim to have borrowed $ 150,000 from Universal on March 29, 1969, and to have used the proceeds to repay Anglo Dutch the $ 140,000 principal, plus $ 1,839 in interest. Petitioners deducted the $ 1,839 *543 as interest expense in 1969. Respondent, however, disallowed this deduction. Petitioners claim to have borrowed an additional $ 75,000 from Universal on June 19, 1970, bringing their total indebtedness to $ 225,000. Petitioners purportedly made two payments of $ 20,000 each to Universal during 1970 to reduce this debt. During June 1970, Universal allegedly assigned petitioners' notes to ACE. In August 1971, petitioners purportedly forward $ 25,000 from the alleged sale of the Saratoga house to ACE in partial payment of this debt. As of December 1971, the balance allegedly owed to ACE was approximately $ 160,000. On December 29, 1971, petitioners opened a commercial bank account and deposited $ 212,000. The deposit was made up of three checks, one in the amount of $ 99,000, one in the amount of $ 90,000, and one in the amount of $ 23,000. $ 23,000 of the deposit was allegedly obtained from a loan to petitioners from the Patsey Children's trust. Petitioners allegedly entered into three Loan and Security Agreements with their children on December 30, 1971, and borrowed a total of $ 99,000. The remaining money for the deposit is from an alleged $ 90,000 sale of petitioners' *544 partnership interest. These funds of $ 212,000 were allegedly transferred to ACE and were the grounds for petitioners' 1971 claimed interest deduction of $ 52,000 which respondent disallowed. Petitioners claim to have repaid the Patsey trust loan of $ 23,000 plus approximately $ 5,900 in interest in July 1974. Petitioners, however, introduced no evidence to substantiate this claim. OPINION Respondent's determinations are presumptively correct and petitioners bear the burden of proving that the determinations are in error. Welch v. Helvering,290 U.S. 111 (1933). The record contains little evidence to contradict these determinations or explain the complex transactions. Accordingly, after review the entire record, we find that: A. Subject to respondent's partial concession for 1969, discussed supra, petitioners are not entitled to the deductions and tax credits they claimed in the taxable years 1968, 1969 and 1970 as their distributive share of PPP's net losses and investment tax credits. B. Petitioners must recognize an additional $ 1,222 of capital gains for taxable year 1970 to reflect their distributive share of respondent's adjustments to PPP's *545 section 1231 gain andd disallowance of PPP's long-term capital loss. C. Petitioners never owned the Saratoga house and are not entitled to deduct depreciation, interest, and taxes incurred to allegedly rent the Saratoga house for the taxable years 1969, 1970, and 1971 and are required to report as ordinary income only the $ 11,184.89 they claim to have received from the purported sale of the house. D. Petitioners are not entitled to deduct the interest expenses they claim to have incurred in the taxable years 1968, 1969, and 1971 on loans from Margolis system entities. E. Petitioners do not have to recognize $ 9,000 in interest income allegedly received from Bonaire in 1969. F. The underpayments in each year were due to petitioners' negligence, and they are liable for additions to tax under section 6653(a).
A. Partnership Losses and Tax Credits
Respondent properly determined that $ 59,000 of petitioners' contributions to PPP were paid from the proceeds of alleged loans from Margolis system entities. Contributions made from borrowed funds are recognized for tax purposes only if the underlying debts are legitimate. Petitioners testified that they considered themselves *546 obligated to repay these debts. As discussed below, these alleged loan transactions were shams which did not create genuine debts and did not legally obligate petitioners to repay the proceeds. These alleged payments do not represent legitimate contributions to capital which increase the basis of petitioners' partnership interest. PPP reported net losses for the taxable years 1968, 1969, and 1970, and an investment tax credit in 1969, of which petitioners claimed their distributive share. Respondent determined, however, that PPP's net losses were overstated and that the partnership was not entitled to its 1969 tax credit. These adjustments to PPP's income increased petitioners' distributive share of the partnership's income. Respondent's adjustments are presumptively correct and petitioners bear the burden of proving that the determination is in error. Welch v. Helvering, supra.
Petitioners failed to present evidence showing that respondent's adjustments to PPP's income were in error. Accordingly, petitioners' percentage interest in PPP and their distributive share of partnership income, deductions, and investment credit was correctly determined by respondent's *547 statutory notice, except for taxable year 1969 which requires recalculation in light of respondent's agreed changes.
B. Additional Capital Gains
Respondent determined that petitioners must recognize a capital gain of $ 1,222 for the year 1970 based on respondent's adjustments to PPP's capital and section 1231 gains. Respondent's determinations are presumptively correct and petitioners bear the burden of proving them in error. Welch v. Helvering, supra.Petitioners failed to present any evidence to prove respondent's adjustment was erroneous. Accordingly, we find that respondent correctly increased petitioners' 1970 capital gains by $ 1,222 to reflect their distributive share of the above adjustments to PPP's income.
C. The Saratoga House
Petitioners assert that they are entitled to deduct depreciation, taxes, and interest expenses incurred to lease the Saratoga house to Mr. Lund. They also claim that the 1971 sale of the property resulted in a $ 1,216 capital gain. Respondent counters that petitioners never owned the property, never leased the property to Mr. Lund, and are not entitled to the claimed deductions. Respondent further claims that petitioners *548 never sold the property to Mr. Lund. Respondent, presumably in the alternative, argues that if petitioners did own the Saratoga house, they must recognize $ 75,000 in income in 1971 resulting from the $ 75,000 received from Mr. Lund for the purported sale. For Federal income tax purposes, the term "sale" is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563 (1965). To decide whether a particular transaction constitutes a sale, the question whether the benefits and burdens of ownership have passed from seller to buyer must be answered. It is a question of fact to be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. Haggard v. Commissioner,24 T.C. 1124 (1955), affd. 241 F.2d 288 (9th Cir. 1956). The substance of a transaction rather than the form in which it is cast determines the resulting tax consequences. Golsen v. Commissioner,54 T.C. 742 (1970), affd. *549 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). It is necessary, therefore, to determine whether the parties to an alleged sale have in fact done what the form of their arrangement purports to do. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). In other words, it must be determined whether the petitioners drafted documents to characterize the transaction as a sale with no economic significance other than the expected tax benefits. See Falsetti v. Commissioner,85 T.C. 332 (1985). Specific factors which have been considered by courts in determining whether a sale has occurred were summarized in Grodt & McKay Realty, Inc. v. Commissioner, supra, at 1237-1238 as follows: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears *550 the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. * * * [Citations omitted.] An additional factor is the presence or absence of arm's-length dealing. Falsetti v. Commissioner, supra, at 354. Petitioners have failed to establish that they, in substance purchased the Saratoga house, so as to be entitled to the deductions claim for 1969, 1970, and 1971, and a recovery of capital upon disposition of the property. Legal title did not pass to petitioners. Those documents in the record which suggest that Continental Title Co. held title on petitioners' behalf do not reflect the true essence of the events which transpired. Mr. Margolis directed Lee Neuhaus, President of Continental Title, to write letters claiming that title to the property was held on petitioners' or World Development's behalf. Petitioners agreed to purchase the property from World Development in a document entitled "Agreement to Buy and Sell." Dale Fuller and Richard Bassett conveyed title to Continental Title in a grant deed dated January 2, 1969, which did not mention World Development. World Development did not *551 possess an interest in the Saratoga house which it could have conveyed to petitioners. Petitioners also allegedly agreed to assume an underlying encumbrance under the purchase agreement. Petitioners testified that they considered only themselves "responsible" for the mortgage but never formally assumed the enforceable legal obligation to pay the mortgage. Further, petitioner Suleiman Abul-Haj testified that he never made any payments to the holder of the deed of trust, Great Western. Petitioners did not explain the repayment structure of the $ 44,000 promissory note allegedly issued to World Development in exchange for the property. In December 1969, petitioners sent $ 20,000 to Universal to be credited against the $ 44,000 promissory note and an additional $ 5,000 to Mr. Lund also to be credited against the note. When the note was later assigned from World Development to World Minerals, N.V., the alleged outstanding principal was still $ 44,000, in apparent disregard of these alleged previous payments. Petitioners allegedly retired the $ 44,000 debt and paid $ 1,000 in interest on June 19, 1970, which brought total repayment to $ 69,000 on a $ 44,000 note. This alleged *552 overpayment suggests that the loan was a sham transaction and that petitioners were not legally obligated to repay their note. Petitioners have not failed to prove that the purchase agreement obligated them to acquire the property, or bound World Development to execute and deliver a deed. There was also an absence of arm's-length dealing throughout the real estate transaction. Petitioners accepted Mr. Lund's valuation of the property at the time of the purported purchase and sale without inquiry into competing offers or placing the property on the open market. In addition, World Development reported on its 1969 tax return that the property was sold to petitioners for $ 79,858 in March 1969. World Development, however, acquired the property in November 1968 for only $ 51,200. This sudden and unexplained price increase of more than 50 percent over only four months illustrates the lack of arm's-length dealing surrounding these real estate transactions. Further, there is no evidence in the record that petitioners were vested of a right of possession, or that they assumed any risk of loss. See *553 Grodt & McKay Realty, Inc. v. Commissioner, supra.
Petitioners are not entitled to the deductions claimed with respect to the Saratoga house since we find that petitioners never owned the house or had any interest in it. Since petitioners never had an interest in the Saratoga house, respondent's apparent alternative position that they realized $ 75,000 gain on the sale of the house is not sustained. Petitioners, however, reported that they received $ 11,184.89 from the sale and paid a capital gains tax of $ 1,216. Since petitioners never owned the Saratoga house, they could not have received this money from its sale and the amount reported as capital gain cannot be so treated. Petitioners have not provided an alternative explanation for the money received and we cannot determine the source from the record. Gross income means all income from whatever source derived. Section 61. We have no alternative but to determine that petitioners received the money from some taxable source, presumably from a Margolis entity. Accordingly, petitioners are taxable on the $ 11,184.89 as ordinary income.
D. Interest Deductions
*554 Interest paid or accrued within the taxable year on indebtedness may be deducted. Section 163(a). "Interest" means compensation for the use of borrowed money. Old Colony R. Co. v. Commissioner,284 U.S. 552 (1932). "Indebtedness" has been defined as the unconditional and legally enforceable obligation for the payment of money. Knetsch v. United States,364 U.S. 361 (1960); Autenreith v. Commissioner,115 F.2d 856 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940). A person has the right to arrange his affairs in a manner that reduces his income tax liability, but it is equally well-established that the substance of a transaction must control over form. Gregory v. Helvering,293 U.S. 465 (1935). Transfers whereby nothing of economic substance is achieved beyond the realization of tax deductions are shams and will not be given effect for tax purposes. Knetsch v. United States, supra;Goodstein v. Commissioner,30 T.C. 1178 (1958), affd. *555 267 F.2d 127 (1st Cir. 1959). Petitioners have the burden of proving that the interest they claim to have paid on loans was actually interest on genuine indebtedness, rather than a subterfuge to create desired tax effects. See Rule 142(a); Welch v. Helvering, supra.
1. 1968 Interest Payment to Anglo Dutch
Petitioners claim to have borrowed $ 90,000 from Anglo Dutch on April 8, 1968, and to have issued a promissory note bearing interest payable quarterly at 10 percent per annum. Petitioners purportedly paid Anglo Dutch $ 9,000 on the promissory note in December 1968, and deducted this amount as interest expense. On the same day as the purported $ 90,000 loan, three Clifford trusts were created for petitioners' children and the entire loan proceeds were purportedly transferred into the trust. Mr. Lund, who purportedly arranged the loan with Anglo Dutch on behalf of petitioners, was also a purported trustee under the childrens' trusts and immediately transferred the full corpus of each trust to Branjon, Inc. In reality a single $ 90,000 check from one Margolis system entity was conveyed to another, through Mr. Lund. The check, although payable *556 to petitioners, was never actually delivered to petitioners, but was sent directly to Harry Margolis on April 17, 1968. There is no evidence the check ever left Mr. Margolis' control. This was obviously not coincidental but part of an elaborate prearranged plan, the objective of which was to achieve desirable tax consequences from an otherwise nondeductible contribution into a trust. Petitioners purported payment of $ 9,000 to Anglo Dutch may not be deducted as interest expense. The loans were shams in which petitioners were not legally obligated to repay principal or interest. 2. 1969 Interest Payment to Anglo Dutch
Petitioners deduced $ 1,839 as interest expense in 1969 which was based on a purported payment of $ 141,850 to Anglo Dutch. This amount, consisted of a purported $ 140,000 in repayment of principal and $ 1,850 in accrued interest. This purported debt arose from promissory notes of $ 120,000 and $ 20,000 issued by petitioners to Anglo Dutch. The $ 120,000 note is the result of a December 1968 consolidation of the previously mentioned $ 90,000 note used to establish the Clifford trusts, and a $ 30,000 note issued in exchange for a purported loan to support *557 petitioners' medical practice. Petitioners have not been able to produce a signed copy of this alleged $ 120,000 consolidated note, however, and Anglo Dutch's own records indicate this purported note was never signed. They have failed to establish that even the form of this note entitles them to the claimed deduction. The alleged $ 140,000 debt was the result of sham transactions and failed to create genuine indebtedness. Petitioners are not entitled to deduct $ 1,839 as interest expense in 1969. 3. 1971 Interest Payments to Universal
Petitioners have failed to establish that they were required, even by the purported form of the transactions presented, to pay $ 52,000 in interest to ACE in 1971. The interest was allegedly paid on two notes from petitioners to Universal in the amounts of $ 75,000 and $ 150,000 which were later assigned to ACE. According to terms of the purported $ 75,000 note, dated June 10, 1970, interest ran only from the date of demand, yet there is no evidence in the record that any demand on this purported note was made upon petitioners. Petitioners have also failed to produce any document or give testimony that they incurred $ 150,000 in indebtedness *558 to Universal in 1969. According to the form as well as the substance of the transactions, no interest was due on the note at the time of the alleged repayment. These are sham transactions lacking economic substance and genuine indebtedness. Petitioners testified that they believed these alleged loans to be legitimate and that they believed themselves to be under an enforceable legal obligation to repay the principal and interest. Petitioners failed to prove that these transactions entitle them to the claimed interest deductions. These were circular transfers of funds in which no money was lent in a substantive sense and the loans do not reflect genuine indebtedness. See Thompson v. Commissioner,631 F.2d 642 (9th Cir. 1980), affg. 66 T.C. 1024 (1976), cert. denied 452 U.S. 961 (1981); Karme v. Commissioner,73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); Perrett v. Commissioner,74 T.C. 111 (1980). [4] Petitioners are not entitled to deduct $ 52,000 as interest expense in 1971. *559 E. Interest Income
Respondent argues in the alternative that if the alleged loans are held to be valid, then petitioners received $ 9,000 in interest income from Bonaire in 1969. Petitioners' alleged loan transactions have been held to be shams which did not create any genuine indebtedness and do not entitle petitioners to the deductions they claimed for interest expense. Accordingly, respondent's alternative position need not be addressed.
F. Additions to Tax
Section 6653(a) provides for an addition to tax in the amount of 5 percent of an underpayment whenever any part of the underpayment is due to petitioners' "negligence or intentional disregard of rules or regulations." Negligence is determined by the reasonable, prudent person standard. Zmuda v. Commissioner,79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). The Ninth Circuit, to which these cases are appealable, has held that a taxpayer's good faith reliance on the substantive advice of an attorney or accountant will avoid the addition to tax for negligence. *560 Betson v. Commissioner,802 F.2d 365 (9th Cir. 1986). We have held similarly. See, e.g., Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272, 283 (1976) ("Reasonable reliance on the advice of an expert suffices to avoid the negligence penalty"). The key to absolution, however, is that the reliance on the tax advisor be reasonable and in good faith. On the record before us, we cannot conclude that petitioners' reliance on any professional advice they may have obtained in preparing the returns in question was either reasonable or in good faith. Contrary to their testimony, petitioners were sophisticated investors who knew, or should have known, that they were participating in an egregious tax avoidance scheme and that the transactions they engaged in did not give rise to legitimate tax consequences. Respondent's determination that petitioners were negligent is presumptively correct and places the burden on petitioners to produce evidence that the imposition of these additions is erroneous. See *561 Pritchett v. Commissioner,63 T.C. 149 (1974); Enoch v. Commissioner,57 T.C. 781 (1972). Petitioners have failed to produce such evidence and respondent's determination of the additions to tax is sustained. Decisions will be entered under Rule 155.
APPENDIX Respondent's Partnership Adjustments
1968
1969
1970
PPP's Reported
($ 404,105)
($ 243,948)
($ 162,598)
Net Income
Additional Income:
Ordinary Gain
($ 1,352)
Rental Income
$ 71,948 from LEA Citrus
Interest Expense
* $ 228,088 Depreciation Expense
86,702 100,827 (Rental)
Depreciation Expense
44,745 (non-Rental)
Legal & Professional
37,015 33,334 Fees
Management Fees
23,613 Accounting Fees
24,223 Salaries & Payroll
12,901 Benefits (SMSC)
Total Adjustments
$ 71,948 * $ 420,162 $ 169,933 Corrected Net Income
($ 322,157)
* $ 176,214 $ 7,335 Other Adjustments:
1969 1970 Investment Tax Credit
$ 9,124 Disallowed
Long Term Loss
($ 32,947)
Adjustment
Section 1231 Gain
3,455 Adjustment
*562 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Mr. Lund was not called as a witness and petitioners' counsel did not explain his absence. ↩
3. See attached appendix. ↩
4. See Gurdin v. Commissioner,T.C. Memo. 1988-31; Meyer v. Commission,T.C. Memo. 1986-328; Ford v. Commissioner,T.C. Memo. 1986-104; Bail Bonds by Marvin Nelson v. Commissioner,T.C. Memo. 1986-23, affd. 820 F.2d 1543↩ (9th Cir. 1987).
*. These amounts require recalculation in light of respondent's concession that PPP is entitled to a further $ 75,000 interest deduction in 1969. ↩