TIM H. SPEARBECK and MARI LYN SPEARBECK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Spearbeck v. Commissioner
Docket No. 15767-92
United States Tax Court
T.C. Memo 1995-357; 1995 Tax Ct. Memo LEXIS 357; 70 T.C.M. (CCH) 258; August 1, 1995, Filed *357 Decision will be entered under Rule 155. For petitioners: Matthew W. Stanley, Jr. and Leon Misterek. For respondent: Robert S. Scarbrough and John Altman. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies and additions to tax in the Federal income taxes of petitioners for the taxable years 1985, 1986, and 1987 in the amounts as follows: Additions to Tax
Sec.
Sec.
Sec. Sec. Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(a)(1)(A)
6653(a)(1)(B)
1985
$ 14,499
$ 725
[1]  --  --
1986
35,516
--
--
$ 1,776
[2]
1987
174,389
--
--
8,719
[3]
Additional
Interest
Sec.
Sec.
Year
6661
6621(c)
120% of interest
on:   1985
$ 3,625
$ 14,499
1986
8,879
35,516
1987
43,597
174,389
All section references are to the Internal Revenue *358 Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. The issues for decision [1] are: (1) Whether respondent properly adjusted petitioners' rental income for the taxable years 1985 through 1987, capital gains in 1986 and 1987, [2] and depreciation recapture in 1987, because petitioners' alleged transfer of real property to Transworld Communications, Ltd., was a transaction which lacked substance; (2) whether petitioners are entitled to a theft loss deduction in 1987; (3) whether petitioners are entitled to a bad debt deduction in 1987; and (4) whether petitioners are liable for additions to tax for substantial understatements of tax, and for increased interest on substantial underpayments attributable to tax-motivated transactions. *359 There is an issue raised by the pleadings of whether petitioners are entitled to itemized deductions in excess of those allowed by respondent. Petitioners have offered no evidence on this issue and have not raised it on brief, so we conclude they have abandoned this issue. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of the petition in this case, petitioners Tim H. Spearbeck (Mr. Spearbeck) and Mari Lyn Spearbeck (Mrs. Spearbeck), husband and wife, maintained a legal residence in Seattle, Washington. Petitioners were married in 1984 and filed their joint Federal income tax returns for the taxable years 1985, 1986, and 1987, with the Ogden, Utah, Service Center. Mr. Spearbeck was born in Tacoma, Washington, in 1936. He graduated from high school in 1955 and, thereafter, went to work selling real estate, first as a salesman and later as a broker. Mr. Spearbeck was employed by his wholly owned S corporation, Pacesetter Homes, Inc. (Pacesetter), a Washington corporation, which was incorporated in October 1964. Pacesetter was engaged in providing real estate agency, brokerage, and management services in the Seattle, *360 Washington, metropolitan area. While operating Pacesetter, Mr. Spearbeck acquired, as his own property, a number of single-family and multi-family rental properties. Mrs. Spearbeck grew up in Coeur d' Alene, Idaho, and graduated from North Idaho College, a 2-year college, in 1965, where she received an A.A. degree in education. Mrs. Spearbeck was employed for a number of years as an office worker for a lumber wholesaler, while being a mother and homemaker. Since 1984, she has helped Mr. Spearbeck operate Pacesetter. At the time of his marriage in 1984, Mr. Spearbeck had acquired approximately twenty rental properties, which were occupied by approximately thirty tenants. On average, petitioners worked 7 days a week and some evenings managing the rental properties. Many of the rental properties Mr. Spearbeck owned had appreciated greatly in value since he acquired them. Mr. Spearbeck understood that, if the properties were sold, he would have a considerable long-term capital gain resulting in his owing additional income tax. Sometime in the early 1980's, petitioners began investigating the possibility of purchasing an annuity by using the rental properties. Mr. Spearbeck contacted *361 several large insurance companies regarding their annuity programs and learned that the insurance company annuities could be purchased only for cash. Petitioners realized that generating cash for an annuity would require either a sale or a refinancing of the rental properties, and that a sale would result in taxable capital gain. Prior to early 1983, while attending an investment seminar, petitioners heard that an investment adviser by the name of Mr. Laban Quimby (Mr. Quimby) was a good person with whom to discuss investments. After hearing of Mr. Quimby, petitioners were told that Mr. Quimby was an investment adviser and international planner who had many wealthy clients and who spoke before employees of a number of large accounting firms. Beginning in late 1982 or early 1983, petitioner spoke with Mr. Quimby several times, and received financial advice and services from Mr. Quimby for which he paid Mr. Quimby $ 7,000. During Mr. Quimby's visits to Seattle, petitioners would meet Mr. Quimby at the airport and drive him to his hotel. Mr. Quimby operated primarily through a company called Republic International Corp. (Republic), located in Nassau, Bahamas. Mr. Quimby considered Republic a service corporation that would provide corporations *362 in the Bahamas, or other offshore places, for clients to use for transferring funds and would furnish the officers and directors an address for the corporation and a mail- forwarding service. Correspondence with each of these corporations would go to the corporation's address in the Bahamas and would be forwarded by the staff of Republic to the appropriate client who controlled the company. Mr. Quimby operated differently from some persons who were assisting people with offshore transactions in that he did not generally keep control of the client's money, but had it placed in a corporation or entity that was owned and controlled by the client. Mr. Quimby, at his seminars, talked about the services Republic could render to clients in this regard as affording asset protection, privacy, and tax planning. The corporations which Mr. Quimby established for his clients generally had their bank accounts in the Bahamas or some other foreign country, which bank accounts were controlled by the taxpayers who owned the corporations. Mr. Quimby was the only person whom petitioners contacted that stated that rental properties could be exchanged for annuity contracts. After discussions with Mr. *363 Quimby, petitioners decided to enter into an arrangement which Mr. Quimby stated would be with a Bahamian entity called Transworld Communications, Ltd. (Transworld). The arrangement Mr. Quimby suggested to petitioners was that they transfer eleven rental properties to an escrow account with Pacesetter continuing to manage the properties until the properties were sold. Pacesetter was to receive a fee for its services in managing the properties. Upon the sale of the properties, Transworld was to transfer to petitioners two annuities that would begin to pay out in the year 2006. Mr. Spearbeck relied primarily on the tax advice of Mr. Quimby in agreeing to this transaction. Mr. Quimby provided Mr. Spearbeck with an opinion letter (from Mr. Paul H. Chappell, an attorney practicing in Chevy Chase, Maryland) concerning the tax consequences of private annuity transactions. The letter stated in part: Any persons other than representatives of Republic International Corporation who may read this letter should not rely upon the description of facts set forth herein and should not construe the contents of this letter as tax advice as to them. Each such person should consult his own tax counsel *364 as to these matters.
Mr. Spearbeck contacted Mr. Richard Ginnis (Mr. Ginnis), a certified public accountant, as to the use of private annuity plans to defer income tax. In the years 1979, 1980, and 1981 petitioner had placed funds in offshore trusts suggested to him by an organization called American Law Association. The IRS investigated Mr. Spearbeck's returns for 1979, 1980, and 1981 and refused to recognize the transactions with the offshore trusts. Mr. Ginnis had represented Mr. Spearbeck before the IRS, and Mr. Spearbeck disposed of the controversy with the IRS by agreeing to pay all the taxes proposed by the IRS. Mr. Ginnis had no knowledge of annuities prior to Mr. Spearbeck's request for his oral opinion. Mr. Ginnis advised Mr. Spearbeck that private annuities were legitimate and were recognized by the IRS. On or about June 27, 1985, Mr. Spearbeck entered into two agreements with Transworld entitled "Annuity Agreements". Under these agreements, Mr. Spearbeck caused eleven deeds to be drawn purporting to transfer eleven of his rental properties to Transworld in exchange for two annuities. Mr. Fred Whyly (Mr. Whyly) signed the documentation on behalf of Transworld. Actuarial *365 computations were provided by Tillinghast, Nelson & Warren, Inc. (Tillinghast). Tillinghast determined that the payments beginning in 2006 were to equal $ 659,933, payable in quarterly installments, if the fair market value of the properties was $ 719,525. In the first annuity agreement, the subject properties were quoted as having a fair market value of $ 477,346.90, but the annuity was described as follows: Transferee wishes to acquire Property as an investment and is willing to make fixed quarterly payments in the amount of Four Hundred thirty-seven Thousand Eight Hundred thirteen United States Dollars (US$ 437,813) quarterly commencing February 1, 2006 * * *
In the second annuity agreement, the subject properties were quoted as having a fair market value of $ 242,178.20, but the annuity was described as follows: Transferee wishes to acquire Property as an investment and is willing to make fixed quarterly payments in the amount of Two Hundred twenty-two Thousand One Hundred twenty United States Dollars (US$ 222,120) quarterly commencing February 1, 2006 * * *
Mr. Quimby told Mr. Spearbeck that if he purchased an annuity, it would be backed by INA Insurance (INA), *366 a large national insurance company. The INA that Mr. Quimby referred to was established by Mr. Quimby in the Bahamas as a subsidiary of Mr. Quimby's corporation, Republic. Mr. James J. Jameson (Mr. Jameson) was the attorney who served as escrow closing agent for Mr. Spearbeck and Transworld. Sometime in 1985, Mr. Spearbeck told Mr. Jameson that he wanted to transfer properties for annuities and that all of the properties were encumbered by mortgages containing due-on-sale clauses. The escrow instructions stated that the deeds were to be drawn and retained by Mr. Jameson, but not recorded. Four of the mortgages, in fact, contained no due-on-sale clauses, and the balance of the mortgages only contained a clause that the mortgagor must consent to sale to prevent the full mortgage loan from becoming due. The escrow instructions additionally provided that the deeds were to be held in escrow until the described properties were sold to third parties or other instructions were received from Transworld. Although Mr. Jameson sent documents to Mr. Whyly in the Bahamas and received documents signed by him, he never met Mr. Whyly and did not remember whether or not he spoke with him on one occasion *367 on the telephone. The deeds purporting to transfer the property from Mr. Spearbeck to Transworld were prepared by Mr. Jameson and signed by Mr. Spearbeck, but were never physically delivered to Transworld. Mr. Jameson received no instructions other than those received verbally from Mr. Spearbeck and escrow instructions from Transworld and Mr. Spearbeck. All other directions regarding the subject properties came from Mr. Spearbeck. The warranty deeds executed by Mr. Spearbeck on June 27, 1985, were held by Mr. Jameson in his office and were not recorded. No excise tax was paid on the transactions reflected in the warranty deeds. Petitioners did not report the rental income or the gain generated by the subject properties after June 27, 1985, on their 1985, 1986, and 1987 Federal income tax returns. After Mr. Spearbeck signed the warranty deeds and annuity agreements on July 25, 1985, petitioners continued to collect rent on the properties until November 6, 1987, by which date nine of the properties had been sold to third parties. On Schedule E of their 1985 Federal income tax return, petitioners reported $ 89,266 in rents received and reported net rental income of $ 194. On Schedule *368 E of their 1986 Federal income tax return, petitioners reported $ 41,337 in rents received and reported net rental income of $ 12,982. On Schedule E of their 1987 Federal income tax return, petitioner reported $ 51,441 as rents received and reported $ 6,972 in net rental income. In April 1987 petitioners sent $ 17,740.65 in checks to Transworld in the Bahamas stated to be as payment for rents received. Mr. Spearbeck made a list of all security deposits and last months' rents given by tenants of the eleven properties, and on July 15, 1985, transferred those moneys from petitioners' personal account to Pacesetter's property management trust account. These checks totaled $ 14,392. When the subject properties were sold to third parties, all deeds conveying the properties were recorded with the auditor's office for King County in the State of Washington and were signed by Mr. Spearbeck individually or by Mr. Spearbeck and Transworld as grantor. Mr. Spearbeck and Transworld are listed as sellers on five of the nine deeds transferring the subject rental properties to third parties. On four of the deeds, Mr. Spearbeck alone is listed as the seller. Some attorneys representing purchasers *369 insisted that the deeds include Transworld since its name appeared on the purchase and sale agreements. Mr. Spearbeck executed all of the deeds, since he was the record owner of the properties. From the date of the purported transfer of the subject properties to Transworld to the date when the properties were sold to third parties, Pacesetter continued to manage and collect rents on the properties. Pacesetter received management fees and properly reported all such fees for Federal income tax purposes. Pacesetter began listing the properties for sale sometime in 1985. The sales of the subject properties to third parties commenced with a single sale on December 11, 1986. The remaining sales occurred in 1987, with the last sale, as heretofore stated, on November 6, 1987. The specifics of each sale as recorded with the King County auditor's office are as follows: -- On February 4, 1987, 4313-15 - 4th NW was sold to Donna Marie Almquist for $ 107,000. The sale was recorded by the King County Auditor's Office on February 9, 1987; -- On December 11, 1986, 312 NW 45th Street was sold to Peter Jowise for $ 112,500. The sale was recorded by the King County Auditor's Office on December *370 18, 1986; -- On February 4, 1987, 4320 Evanston Ave. N. was sold to Donna Marie Almquist for $ 114,950. The sale was recorded by the King County Auditor's office on February 9, 1987; -- On April 3, 1987, 725 N. 74th was sold to Charles E. Londo for $ 67,000. The sale was recorded by the King County Auditor's Office on April 15, 1987; -- On June 17, 1987, 745 N. 75th was sold to Colleen Urban for $ 79,950. The sale was recorded by the King County Auditor's Office on June 23, 1987; -- On June 23, 1987, 4320 - 36th Ave. W. was sold to B. Gerald Hartman for $ 235,000. The sale was recorded by the King County Auditor's Office on June 25, 1987; -- On June 30, 1987, 6531 Palatine Ave. N. was sold to Mary Kirk for $ 79,500. The sale was recorded by the King County Auditor's Office on July 1, 1987; -- On July 13, 1987, 6533 Palatine Ave. N. was sold to Laszlo Hajdu for $ 79,950. The sale was recorded by the King County Auditor's Office on July 20, 1987; and -- On November 6, 1987, 1003 N. 36th St. was sold to Paul Quam for $ 75,000. The sale was recorded by the King County Auditor's Office.(exh 14-N; stip PP 50-58)
The following schedule illustrates the adjusted basis *371 and sales price for each of the above-listed properties at the time of its sale to a third party: Adjusted basis
when sold to
Properties
Year of sale
third parties Sales price 312 N.W. 45th
1986
$ 32,060
$ 112,500
1003 N. 36th
1987
21,124
75,000
4315 4th N.W.
1987
31,989
107,000
4320 36th W.
1987
85,386
235,000
4320 Evanston
1987
32,158
114,950
6531 and 6533
Palatine
1987
48,328
159,450
725 N. 74th
1987
8,132
67,000
745 N. 75th
1987
19,228
79,950
As each of the subject properties was sold, the sales proceeds were paid into the escrow account by checks issued to Mr. Jameson's trust account. Mr. Jameson applied portions of the proceeds to pay off the property mortgages, brokerage and other fees and expenses as instructed. The checks for the balance of the sales price were forwarded either by Mr. Jameson or given to Mr. Spearbeck and forwarded by him to Nassau to be deposited into accounts maintained in Nassau, Bahamas. Checks were written on Mr. Jameson's trust account made payable to Transworld totaling $ 561,102.60. The amounts transferred were as follows: Date
Amount
12/23/86
$ 56,936.71
01/05/87
11,266.11
02/17/87
62,990.53
02/17/87
70,905.17
04/17/87
48,720.97
06/30/87
113,798.87
07/06/87
34,389.55
07/08/87
53,406.32
07/20/87
6.34
07/20/87
34.00
07/21/87
72,228.74
11/10/87
36,419.29
Total
561,102.60
*372 The last check written by Mr. Jameson payable to Transworld was written in November 1987, but cleared on or about March 9, 1988. Mr. Quimby and his former spouse were arrested on September 30, 1987, on charges of conspiracy to defraud the United States, in violation of 18 U.S.C. section 371. On March 14, 1988, Mr. Quimby was convicted of conspiracy to defraud the United States by impeding, impairing, obstructing, and defeating the IRS in the ascertainment, computation, and assessment of income taxes in violation of 18 U.S.C. section 371. Mr. Spearbeck has made no attempt to bring suit against Mr. Quimby. Sometime in November 1987, petitioners learned that Mr. Quimby had been arrested. Mr. Spearbeck and his brother, Ned Spearbeck, traveled to the Bahamas in January 1988. Ms. Evelyn Knowles (Ms. Knowles), who managed Republic for Mr. Quimby in the Bahamas, was called, and Mr. Spearbeck and his brother met with Ms. Knowles during the time they were in the Bahamas. Mr. Spearbeck and his brother also visited the Canadian Imperial Bank of Commerce, where Transworld maintained a bank account. Mr. Spearbeck did not *373 file a loss report or theft report in the Bahamas nor was a report filed in the United States regarding any claimed theft or loss from transactions with Mr. Quimby. The trip Mr. Spearbeck made to the Bahamas was not in an attempt to recover any lost or stolen money. Mr. Spearbeck never visited the Bahamas prior to 1988 to observe the operations of Transworld or other Mr. Quimby-related companies. Mr. Spearbeck has no documents that show an annuity was funded. Mr. Jameson returned the deeds to the two properties that remained unsold to petitioners. In the spring of 1987, Mr. Spearbeck contacted a Mr. Paul A. Merriman (Mr. Merriman) who was engaged in managing money for clients. Mr. Spearbeck told Mr. Merriman that he knew persons in the Bahamas who had money that they placed with investment managers, and he thought they might be interested in Mr. Merriman's services. The client Mr. Spearbeck recommended to Mr. Merriman was Warren Court. Warren Court did open an account with Mr. Merriman, and Mr. Merriman had the funds held in a brokerage account with Charles H. Schwab Co. (Schwab), in Seattle under the name of Warren Court. Sometime in 1987, Mr. Merriman established the account *374 for Warren Court. It was Mr. Merriman who suggested that the Warren Court account be established at Schwab to permit margin trading and to provide Mr. Merriman with flexibility in trading securities. Warren Court opened the account with a $ 150,000 check drawn on April 10, 1987, and added $ 350,000 to the account on September 30, 1987. At some point, Mr. Whyly sent Schwab a letter requesting that Mr. Spearbeck receive duplicate statements and confirmations from the Warren Court account, and Schwab sent duplicate account statements to Mr. Spearbeck. Mr. Merriman has not met Mr. Whyly or any other person identified as an employee or officer of Warren Court. On July 28, 1987, Mr. Spearbeck wrote a letter to Ms. Knowles, Republic International, in Nassau, Bahamas, which stated in part: You will find enclosed a bill from Paul A. Merriman & Associates in the amount of $ 519.23. Please draw a cashers [sic] check from Warren Court, International to Paul A. Merriman & Associates for the $ 519.23 and mail it back to me for payment.
On July 28, 1987, Mr. Spearbeck also wrote a letter to Ms. Knowles enclosing nine checks totaling $ 275,169.94, which Ms. Knowles was instructed to deposit *375 to Transworld. In 1988 the Warren Court account with Schwab was closed and two checks made payable to Warren Court, one dated in August 1988 and one dated in September 1988, were sent to Mr. Merriman, who forwarded them to Warren Court. On April 13, 1992, respondent issued a statutory notice of deficiency to petitioners for the taxable years 1985, 1986, and 1987. Some adjustments in the figures determined by respondent in the notice of deficiency have been made by agreement of the parties and stipulated into the record. Respondent determined that the net income reported by petitioners from rental activities on their Federal income tax returns with respect to the eleven properties purportedly transferred to Transworld should be increased by $ 46,681 (adjusted to $ 26,970), $ 60,852 (adjusted to $ 29,450), and $ 35,384 (adjusted to $ 7,068) for the taxable years 1985, 1986, and 1987, respectively. Respondent determined that ordinary income due to depreciation recapture should be included in petitioners' income for the taxable year 1987 in an amount of $ 30,885 (adjusted to $ 29,796) in connection with the sales in 1987 of certain of the rental properties purportedly transferred to *376 Transworld. Respondent further determined that capital gain income was required to be included in petitioner's income in the amounts of $ 32,966 (adjusted to $ 28,144) and $ 543,289 (adjusted to $ 489,601) for the taxable years 1986 and 1987, respectively, from the sale of the rental properties. In the alternative, respondent determined that petitioner realized a gain during 1985 in the amount of $ 859,259 from the purported transfer of the eleven properties to Transworld, with part of that amount being subject to depreciation recapture and treated as ordinary income. In addition to the above determinations, respondent also determined that petitioners were liable for various additions to tax and increased interest as hereto set forth. OPINION This case is purely factual. Petitioners rely on the testimony of Mr. Spearbeck and, based on that testimony, contend that in 1985 Mr. Spearbeck transferred eleven properties to Transworld in valid transfers under an agreement that for the transfer of these properties petitioners would receive annuities. Petitioners state that the transfers were nontaxable, since the tax would not arise until the annuities were paid beginning in 2006. Petitioners *377 state that the management by Pacesetter of the properties and the collection of rents by Pacesetter was in accordance with an agreement between Mr. Spearbeck and Transworld. Petitioners do not explain why the only transfers of amounts of rentals to Transworld was a little less than $ 18,000, but do contend that the management by Mr. Spearbeck and Pacesetter was a legitimate operation, and the rental income was not that of petitioners in the years 1985, 1986, and 1987, even though the funds were not transferred to Transworld. The primary if not the only support of petitioners' position is the testimony of Mr. Spearbeck. Respondent takes an entirely different view of the facts. Respondent contends that based on the evidence in the record the conclusion should be reached that the transactions between Mr. Spearbeck and Transworld lacked economic substance, that petitioners kept as their own funds the rental income collected from the properties managed by Pacesetter during the years here in issue, and that the sale of these properties was made when they were transferred in 1986 and 1987 to third parties on deeds signed by Mr. Spearbeck and, in some instances, on behalf of Transworld. *378 We do not believe the testimony of Mr. Spearbeck that he did not know anything about Transworld and had no interest in Transworld other than dealing with it to arrange an annuity in return for his properties. We do not believe that Mr. Spearbeck would have transferred these valuable properties to Transworld with no knowledge about its business and operations if he had not had some control over Transworld's assets, or the ownership of those assets. Mr. Quimby's ex-wife, who worked with him as a part-time secretary and was aware of his activities, testified that Mr. Quimby in his seminars would refer to offshore operations for asset protection, privacy, and tax planning. She also testified that in Mr. Quimby's operations the corporations that he would form to assist his clients in tax savings would be owned by the clients, and the clients would keep control of their own money as contrasted with other tax planners with whom she was familiar who would maintain control over the client's offshore money. Also, we do not believe that Mr. Spearbeck would have been furnished statements from Schwab with respect *379 to the Warren Court account if he had had no interest in that account. We certainly do not believe his statement that he did not know why he was furnished the statements from the Schwab-Warren Court account and just laughed and threw them in the garbage when they came. We do not believe that a brokerage company, without some knowledge of petitioners' having a reason to have a statement of an account in a name such as Warren Court, would have furnished such account statements to petitioners. Also, the way in which the properties were transferred in 1985 strongly suggests a control being retained by petitioners with respect to all aspects of Transworld. No one who testified at the trial ever admitted to having met Mr. Whyly personally, although Mr. Whyly signed documents for Transworld. Mr. Jameson was not sure whether he ever talked to Mr. Whyly on the telephone. He did know that he did not talk with Mr. Whyly on the telephone more than once, since primarily documents were mailed to the Bahamas and returned signed by Mr. Whyly without Mr. Whyly's indicating in what capacity he represented Transworld. Likewise, it was Mr. Whyly who directed Schwab to send copies of Warren Court's brokerage *380 statements to Mr. Spearbeck, but Mr. Merriman never met or talked with Mr. Whyly. We, therefore, do not accept as true petitioners' version of any facts with respect to petitioners' relationship with Transworld and Warren Court and the transfers Mr. Spearbeck purportedly made of his real properties. However, in this case, totally aside from our disbelief of Mr. Spearbeck's testimony, there is insufficient evidence in the record for petitioners to carry their burden of proof of showing errors in respondent's determination. Petitioners argue that the burden is on respondent to show that they did receive income, rather than on petitioners to establish a negative. Petitioners rely on the cases of Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), and Keogh v. Commissioner, 713 F.2d 496 (9th Cir. 1983), T.C. Memo. 1981-438, in support of their position. This case is totally different from the Weimerskirch case. In Weimerskirch v. Commissioner, supra, the Commissioner had determined income from drug activities *381 against an individual primarily on suspicion and with no evidence of the taxpayer's participation in any drug activities. In the instant case, the record shows that petitioners received rental income that they retained in each of the years here in issue, that they drew deeds purporting to transfer property, and in later years drew deeds actually transferring property, and a number of other facts which make it clear that respondent had sufficient basis for the notice of deficiency for the burden to be on petitioners to show error in respondent's determination. Keogh v. Commissioner, supra, distinguishes cases involving omitted income from cases involving claimed deductions. The Court stated at 501 -- We have repeatedly said that (1) the Commissioner's initial determination that a taxpayer has received unreported income is presumptively correct, (2) the taxpayer has the burden of overcoming this presumption by a preponderance of the evidence, and (3) when a taxpayer has overcome the presumption by competent and relevant evidence, the presumption disappears and drops out of the case. Thus, the burden of proving the deficiency reverts *382 to the government. United States v. Stonehill, 9 Cir. 1983, 702 F.2d 1288, 1294; Karme v. C.I.R., 9 Cir., 1982, 673 F.2d 1062, 1065; Herbert v. C.I.R., 9 Cir., 1966, 377 F.2d 65, 69. The rule is different where claimed deductions are involved. As to these, the taxpayer has the ultimate burden. Rockwell v. C.I.R., 9 Cir., 1975, 512 F.2d 882, 886.
Here, respondent determined that petitioners received funds not reported on their returns, and the burden is on petitioners to show error in this determination. Not only have petitioners failed to show that they did not receive the funds, the record affirmatively shows that they did receive the funds. While, as petitioners argue, the Court of Appeals for the Ninth Circuit may take a slightly different view from some of the courts on "burden of proof" in omitted income cases, petitioners have not met the burden of proof standard of the Ninth Circuit. The record shows that petitioners drew up warranty deeds purportedly transferring property to Transworld and left them in escrow rather than having them delivered to *383 Transworld. The purported reason for leaving the deeds in escrow was the fact that the mortgages on the properties contained due-on-sale clauses. The escrow agent never checked these mortgages, and the facts here show clearly that at least four of the eleven properties had no such provision, and it is questionable whether the provisions in the mortgages with respect to the other properties were due-on-sale clauses. Certainly, they were not any absolute due-on-sale clauses. Also, the facts that: (1) two properties which were not sold to third parties were returned to petitioners, (2) petitioners managed the properties, and (3) except for a small sum, the rentals were kept by petitioners or Pacesetter, which was an S corporation totally controlled by petitioners, show that petitioners retained control of the properties. In other words, Mr. Spearbeck kept control of both the properties and the income from the properties. The purported annuities for which the properties were transferred were overstated by vast amounts in the purported annuity document, and neither Transworld nor petitioners attempted to make any correction of this. In our view, under the facts here, petitioners have totally *384 failed to show that there was any actual sale of the properties by them to Transworld in 1985. Even on the basis of whether the burdens and benefits from the properties went from petitioners to Transworld, which issue we do not need to reach, since, in our view, clearly here the so-called "sale of these properties" in 1985 was without economic substance, see Perrett v. Commissioner, 74 T.C. 111 (1980), affd. without opinion 679 F.2d 900 (9th Cir. 1982), there would be no sale in 1985 shown by the facts in this record. Some of the considerations in determining whether a sale has transpired under the "benefits-burdens" analysis are whether the purchaser obtains right of possession; which party bears the risk of loss or damage to the property; which party receives the profits from the operation or sale of the property; the presence or absence of arm's-length dealing; whether the cash flow of property was surrendered to the seller; who has long-term possession and control over the property; who is at risk if there is a condemnation, casualty, or economic abandonment; and whether the seller or purchaser is liable to other creditors *385 as principal. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981). In this case, although a deed was drawn by petitioners to Transworld, it was never delivered or recorded, and petitioners remained the record owner of the properties with Transworld, making no attempt to exercise any possessory rights. The eleven properties remained rented to the same tenants as before their transfer to Transworld, and petitioners continued to manage and collect rents from these rental properties. Therefore, the possessory benefits stayed with petitioners. The record does not show who bore any risk of loss. Certainly, since the mortgage holders were unaware of the deeds that were drawn, petitioners would remain liable to the mortgage holders for any loss or damage to the rental properties and, since there is nothing in this record to show that the renters were informed of any transfer, petitioners would likewise remain liable to them. The record does not show that Transworld carried any insurance on the properties. The record does not show that any appraisal was made of the properties before the deeds were drawn. The rentals from the properties *386 were retained by petitioners with the possible exception of a little less than $ 18,000. Certainly, there is nothing here that supports any arm's-length dealing between petitioners and Transworld. In fact, the escrow agent never saw any person representing Transworld and is not sure that he ever spoke with any person representing Transworld. Documents were merely sent and returned signed. The whole operation shows a lack of arm's-length negotiation. The petitioners did not turn the cash flow of the rental properties over to Transworld, but all funds remained under their control. Petitioners continued to have the same degree of control and possession as they had before the transfer. In fact, there is nothing here to indicate that the transaction whereby petitioners lodged some executed deeds with an escrow agent did, in fact, transfer the properties. However, it is clear that it was necessary for petitioners to join in the sale of the properties in late 1986 and 1987 for the properties to be sold to third parties. Even though there is some testimony in the record that the checks from the sales went to Transworld, there is a transmittal letter of over $ 275,000 in checks from the sale *387 proceeds of these properties in 1987 that obviously came through petitioners, since petitioners wrote a letter to Ms. Knowles sending these checks to her. We, therefore, conclude that there was no sale by petitioners of the eleven properties in 1985, but that petitioners retained ownership. We further conclude that in 1986 and 1987 sales were made by petitioners of nine of these eleven properties, and the deeds petitioners had drawn to the other two properties were returned to them. Therefore, on the basis of the evidence, we sustain respondent's determination of the tax liability of petitioners, except with respect to the reduction in some of the amounts agreed to by stipulation of the parties. Petitioners, as an alternative, contend that if we sustain respondent's determination, then in 1987 they should be entitled to a loss deduction because of the indictment of Mr. Quimby and their conclusion that after his indictment they had sustained a loss. As we have previously stated, we do not believe petitioners actually did sustain a loss, since we do not believe the testimony of Mr. Spearbeck with respect to the ownership of the Warren Court account. However, totally aside from this, *388 petitioners have made no showing of sustaining a loss in 1987. Petitioners did not report their claimed loss either to the Bahamian police or the United States police, and they made no attempt to obtain reimbursement from Mr. Quimby, or through the Warren Court account which Mr. Spearbeck stated that he thought was Mr. Quimby's account, or in any other manner. In fact, Mr. Quimby was not convicted until the spring of 1988, but petitioners made no efforts to recover any amounts either from him or from any funds that they might locate that belonged to Mr. Quimby. Therefore, under no circumstances have petitioners shown by any evidence that they sustained a loss of any funds from the properties sold in the years 1986 and 1987. For these same reasons, and the additional reason that petitioners have shown no debt to them from Mr. Quimby, the evidence does not support petitioners' claim to a bad debt deduction in 1987. Therefore, again based on this record, we sustain respondent's determination with respect to petitioners' capital gain in 1986 and 1987 with the exceptions of the concessions which respondent has made. Petitioners contend that they are not liable for additions to tax for *389 negligence under section 6653(a) for the taxable year 1985 and section 6653(a)(1) for the taxable years 1986 and 1987. Negligence under section 6653 is defined as the lack of due care or the failure to do what a reasonable and prudent person would do in a similar situation. Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989). Petitioners bear the burden of proving that they were not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioners have failed to show that they were not negligent. There is no evidence that petitioners made a reasonable attempt to comply with the statutes or regulations with regard to reporting the transaction here involved on their Federal income tax returns. Therefore, we sustain the negligence addition. Section 6661 imposes an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is defined as the tax required to be shown on the return, less the tax actually shown on the return, reduced by any rebates. Sec. 6661(b)(2)(A). *390 An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Section 6661(b)(2)(B) provides that in determining the amount of the understatement, the total understatement is reduced by the items for which the taxpayer had substantial authority for the position taken on the return or adequately disclosed the relevant facts on the return. Petitioners have not shown any substantial authority for their position. There was also no adequate disclosure of the relevant facts on petitioners' returns. Petitioners attached to their 1985 Federal income tax return a worksheet stating that they had purchased an annuity in exchange for the rental properties, but did not reveal the nature of the underlying transaction. Therefore, the addition to tax under section 6661 is sustained. See Schirmer v. Commissioner, 89 T.C. 277, 284-286 (1987). Section 6621(c), as applicable to the years at issue, provided for a special interest rate with respect to any substantial underpayment attributable to tax-motivated transactions. A substantial underpayment attributed to tax-motivated transactions *391 was defined to mean any underpayment of taxes for a taxable year attributable to one or more tax-motivated transactions, if the amount of the underpayment for such year attributable to such transactions exceeds $ 1,000. Under section 6621(c)(3), a tax-motivated transaction includes transactions lacking economic substance. Price v. Commissioner, 88 T.C. 860, 888-889 (1987). Therefore, the section 6621(c) addition is sustained. Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment described under sec. 6653(a)(1)↩ that is attributable to negligence or intentional disregard of the rules or regulations.
2. 50 percent of the interest due on $ 35,516.↩
3. 50 percent of the interest due on $ 174,389.↩
1. Petitioners conceded in their brief that they are not entitled to itemized deductions in 1985 for interest and taxes in the amounts taken on their Federal income tax return.↩
2. In the alternative, respondent determined that petitioners had a capital gain of $ 859,259 in 1985.↩